**Patrick Timothy RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–00–409–CR.**

Court of Appeals of Texas, Corpus Christi.

Aug. 1, 2002.

Rehearing Overruled Sept. 5, 2002.

~693

John H. Hagler, Attorney at Law, Dallas, for Appellant.

William T. (Bill) Hill, Jr., District Attorney, Dallas, for The State.

Before Chief Justice VALDEZ and Justices DORSEY and HILL [1].

---

1. Retired Justice John Hill assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1998).

## OPINION

JOHN HILL, J. (Assigned).

Patrick Thomas Richardson appeals his conviction of the murder of his wife upon his plea of guilty to a jury. The jury, failing to find that Richardson acted under the immediate influence of sudden passion arising from an adequate cause, assessed his punishment at sixty years confinement in the Texas Department of Criminal Justice, Institutional Division, and a fine of $10,000. Richardson presents twelve issues in this appeal. We affirm.

### SUDDEN PASSION—FACTUAL SUFFICIENCY

Richardson contends in issue one that the jury's failure to find that in killing his wife he acted under the immediate influence of sudden passion arising from an adequate cause is so against the great weight and preponderance of the evidence as to be manifestly unjust. We will review all the evidence and set aside the verdict only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Dudley v. State*, 992 S.W.2d 565, 567 (Tex.App.—Texarkana 1999, no pet.); *Naasz v. State*, 974 S.W.2d 418, 423 (Tex.App.—Dallas 1998, pet. ref'd).

Jason Salisbury, a fire fighter and paramedic for the City of University Park, testified that on September 19, 1999, he was dispatched to 4225 Colgate, where he found the body of Richardson's wife Mary. He indicated that Richardson was kneeling over his wife when he walked in the study where Mary's body was located. He related that Richardson made no response when he asked him what was going on. In Salisbury's opinion, Richardson looked surprised that Salisbury was there. Salisbury stated that Richardson's suit was covered with blood and that blood was dripping from his hands.

Salisbury testified that Richardson never replied to his question as to what was going on. He related that Richardson appeared calm, not extremely disturbed or distraught. He indicated that Richardson was not crying, nor was he shaking and trembling.

Salisbury indicated that he could not check the victim's pulse because her neck was gone. He described the wound as a slash that was so deep that he could actually see a vertebra. Later he testified that in his opinion there was not just one slash to the neck because the wound was pretty deep. He stated that he found scissors, within arm's reach of Richardson, near the body and covered with blood. He also related that there was an extension cord that went all the way up to the victim's hair in the back of her head.

Mike Shanley, a family friend, testified that on the day of the murder he took his children to the Richardson home at 12:30 p.m. so that they could attend a children's play with the Richardson children. He indicated that at the request of a police officer he took the Richardson children to his home. He stated that he overheard one of the Richardson children say to his son that his daddy had jumped over the couch, that his daddy did it. He said that when his wife responded that his daddy did not do it, the child stood up and said that he did do it, that he had seen him do it. He related that he also recalled a comment about a wire and about scissors. He testified that he heard one of the Richardson children say that he had wanted the scissors to cut the wire.

Robert Williams, the deceased's brother, testified about her and about their family and the relationships between Mary, Richardson, and the rest of her family. As to Richardson, Williams said that Richardson had no personality. He indicated that he

did not interact with anyone. He verified that Mary had filed for divorce on September 8. He related that if he had known that September 19 was the date that Richardson was supposed to move out, he would have been there.

Cathy Marr testified that on the day of the murder she was working for the City of University Park as a 911 operator. She identified the tape of the 911 call from the residence made while Richardson's attack against the deceased was in progress. Marr indicated that she could hear a commotion in the background, and that she could hear someone saying, "No, no," "No, daddy," "Don't hurt me," "Get off me," Help," and "Help, get off me."

Ann Ratelle testified that she knew the deceased from the Episcopal School of Dallas. She indicated that on the day of the murder her husband saw Richardson at the 11:00 a.m. service at St. Michael's. She related that at about 1:15 or 1:20 her husband woke her up to tell her about the murder, indicating to her that she needed to go where the children were. She stated that at the Shanley residence she and others were playing with the children. She indicated that later John Robert, one of the Richardson children, who had not said anything while they were playing, came over to her and said, "Did you see my mommy's face?" Ratelle said that she replied that she did not. The child then said, "There was blood everywhere on her neck. There was this wire. He cut her, he did it. My daddy did it." When he said that, his sister Mary Beth said, "No, John Robert, he was trying to help her. It's okay, Boo–Boo. Shh, Boo–Boo, it's okay." According to Ratelle, John Robert just looked at Mary Beth and said, "No."

Robert Breckenridge testified that he came to the Richardson residence at about 1:30 p.m. the day of the murder in his capacity as a field agent for the Dallas County medical examiner's office. He described the deceased's wounds as one of the most horrific throat wounds he had ever seen. He indicated that he found an overturned lamp with its cord tangled in the deceased's hair. He related that the cord was so tangled with the deceased's hair that it was transported from the scene with her body. He noted an end table in the middle of a walkway that had blood extended under it and had photo albums under it. He acknowledged that he did not know if the table was out of place, but noted that most people don't leave tables in the middle of a walkway. He also referred to another table that was overturned and blocking the entrance to an adjoining room. He indicated that he saw a Sunday bulletin from St. Michael's Church. Breckenridge noted that he found a pair of scissors with blood and hair on it. He related that he found an earring and that one of the deceased's ear lobes was torn. Based on the objects that he saw, Breckenridge concluded that there had been a struggle in the room.

Nathaniel Williams testified that he had worked on and off for the deceased's family since she was sixteen years old. He related that on the day of the murder he went to the Richardson residence to take some furniture from Kerrville that the deceased's mother had sent to her. He indicated that when he drove up, Richardson asked him where he was going with the furniture, then told him not to bring any more furniture there.

Williams indicated that Richardson asked him if he knew that the deceased was divorcing him. He said that Richardson stated that it had to do with more money. According to Williams, Richardson looked at the house and said, "All of this beautiful house and she's not happy." Williams testified that he went ahead and took in the furniture and stayed about

thirty minutes. Williams stated that Richardson said nothing else to him while he was there, that Richardson was always a quiet man.

Dr. Jennie Duvall testified that she is a medical examiner for Dallas County. She indicated that she performed the autopsy on the deceased on the Monday after the murder. She verified that the deceased was received along with a table lamp and its lamp cord. She stated that the deceased's death was ruled a homicide. Dr. Duvall said that the deceased suffered many injuries, with the major one being a deep incised wound or cut of her neck. She described the wound as gaping, stretching across the front of her neck, then traveling all the way to behind her right ear to just in front of her left ear. The doctor said the wound measured about seven and one-half inches along the surface of the neck, that it gaped open to a maximum width of two and one-half inches and was extremely deep. In Dr. Duvall's opinion, at least four sawing motions, and probably many more, were required with the scissors to inflict the wound to the deceased's neck.

Dr. Duvall testified that there were other cut wounds of minor significance to the body. Referring to the deep neck wound, she indicated that the nature of the wound made it more consistent with scissors than a sharp knife. She also noted that there were paired wounds to the collar bone and just below the collar bone that would be consistent with scissors.

Dr. Duvall testified that she also found bruises on the deceased. She said that these injuries were consistent with manual strangulation, that some could be fingertips. She also described a scrape to the left side of the deceased's jaw close to the chin, another abrasion just above that, and several short linear abrasions. She indicated that those wounds were consistent with

strangulation, resulting from the deceased trying to pull away while being choked. She also referred to short marks consistent with nail marks, either of Richardson or the deceased. She related that she had seen both this type of injury and the skin abrasions in previous cases involving strangulation. Dr. Duvall agreed that the deceased also had bruising in the oral mucosa under her lip.

Dr. Duvall related that she found burst capillaries consistent with the restriction of blood flow to the deceased's head. She indicated that the deceased's bruises and abrasions were more consistent with manual strangulation than strangulation by ligature. She acknowledged that fingernail marks were consistent with both manual and ligature strangulation. She indicated that a ligature is a rope, a cord, or whatever has been wrapped around the neck tight enough to restrict the blood flow. She verified that the lamp cord that was entangled in the deceased's hair could be used as a ligature. She acknowledged that the findings related to the burst capillaries were also consistent with a ligature strangulation. She indicated that the fact that only the back part of the deceased's neck was intact and the fact that she had a lot of hair could have resulted in the absence of any mark by a ligature.

Dr. Duvall testified that the bruising on the oral mucosa around the deceased's gum line was a blunt force injury that could be caused by a blow to the mouth, falling and striking some object, or a hand or object over the mouth. She said that there was a pattern in the deceased's lungs indicating that she had inhaled blood, and that there was some frothy bloody fluid in her windpipe, both indicating that she was alive when her neck was cut. In Dr. Duvall's opinion, the deceased would have to have been strangled for some time prior to having her neck cut. She said this was

also indicated by the absence of high velocity blood spray from the cutting of the neck.

Dr. Duvall described the extent of the cutting of the deceased's neck in some detail. She indicated that the cut was so deep that the spinal cord was visible. She related that not much of the deceased's neck was left after the cutting, with only an inch and a half of bone and soft tissue remaining to keep her head attached. Dr. Duvall also revealed that there were some abrasions and bruises to the deceased's forearms, to her upper extremities, and a single bruise to her left thigh. She related that the major bruise was on her right forearm. She described one bruise on her arm that was consistent with the pattern on the lamp stand. She concluded that the bruise was consistent with being struck by the lamp or falling on it. She indicated that the location of the bruise was consistent with a defensive injury.

As a result of the autopsy, Dr. Duvall concluded that the cause of the deceased's death was strangulation associated with the deep incised wound to her neck and the sharp force injury to her neck. She also indicated that suffocation was consistent with that type of cause of death. She stated that the most probable cause of death was the sharp force injury to the neck, an injury consistent with having been done by scissors. She estimated that the time that it would take to inflict the sharp force wound was anywhere from several seconds to two minutes. She said she thought it would have taken more effort than if a sharpened knife had been used.

Dr. Duvall testified on cross-examination that a spontaneous domestic homicide is usually spontaneous. She also indicated that crimes of passion are generally overkills with dozens and dozens of stab wounds.

Curtis Ellenborg testified that he is a patrol officer for the City of University Park who was dispatched to the scene, arriving about 12:18, shortly after Officer Velasquez. He said that when he first saw Richardson he was emotionless, with "a real stone emotional look." He elaborated by saying that Richardson did not appear upset or overly angry and was not crying. He described in some detail how all of Richardson's clothing was dripping wet with blood. He said that once Richardson was in a jail cell he did not pace around the cell, did not cry, did not put his head in his hands, or appear traumatized. According to Officer Ellenborg, Richardson just sat on the bed in the cell, then laid down. Officer Ellenborg acknowledged that another report by someone else indicated that Richardson was shocked and traumatized. Officer Ellenborg insisted that he was the one who had spent the most time with Richardson.

John Donahue, a criminalist for the Texas Department of Public Safety, testified that he performed DNA testing on the blood on Richardson's clothing and found that it belonged to the victim. He described hair found on Richardson's clothing as being visually similar to the deceased's hair. He indicated that olive green fibers were found under the deceased's fingernails and that Richardson was wearing an olive green suit. He acknowledged that flesh and blood from fingernail clippings of the deceased were her own.

Patrick Richardson, the seven-year-old son of Richardson and the deceased, testified that his mother was on the floor with his father on top of her. According to the child, she was asking Richardson, "Why are you doing this to me?" Patrick indicated that his father replied, "Why are you doing this to me?" He indicated that his mother also said, "Help" and "Call 911."

Patrick said his father cut her neck with scissors that his father had grabbed from his hand. He related that before he cut her neck he stabbed her in the stomach. Patrick indicated that he had wanted his father to use the scissors to cut the black or brown wire that was on his mother's neck. He indicated that he could not remember telling a lady the next day after the murder that his father had not said anything to his mother.

Dr. Elissa P. Benedek testified that she is a child, adult, adolescent, and forensic psychiatrist. She went into great lengths as to her qualifications as a forensic psychiatrist, especially in the area of children and domestic violence. She stated that she was a past president of the American Psychiatric Association. She also acknowledged being a published author in the field of children and divorce. Dr. Benedek said that the district attorney's office had contacted her regarding the case and that she was going to be paid $350 per hour, with the understanding that her opinions might or might not be helpful to the district attorney's office.

Dr. Benedek testified that prior to interviewing the children, she had read police reports and other materials, including statements by those who had talked to the children previously. She stated that in her opinion jealousy, and jealousy with regard to money, was a portion of the reason why the murder occurred. She also indicated that in view of the fact that there was a knock down, a strangling, and then a stabbing, that the murder took place over a period of time. Therefore, she concluded, it was not a single impulsive act in the heat of passion.

Dr. Benedek acknowledged that she is not from Texas and is not familiar with Texas law. She further acknowledged that she did not know the legal definition of sudden passion and was unfamiliar with the legal definition of adequate cause. She expressed an opinion that at one time an assistant district attorney had explained them to her. Dr. Benedek also acknowledged that she is not a criminologist, not a medical examiner, and not a crime scene expert.

Dr. Benedek acknowledged on cross-examination that one source of her opinion as to the cause of the murder was what Patrick told her. She indicated that Patrick had said, "I think he was mad. Maybe he was jealous." She said Patrick told her that his father was jealous of his mother because his grandfather had given his mother $2500 in gold coins. Dr. Benedek also acknowledged that the interviews with the children did not disclose any prior domestic violence.

Dr. Benedek noted that Patrick had stated during an interview, "When I was in the room there was a wire on my mama's neck. I didn't remember the wire at first but Ga–Ga told me." She said that Mary Beth, another of the children, told her, "My mom was arranging the furniture that Ga–Ga sent to us. I heard a crash, then I think maybe she dropped something, and then I looked and saw my dad was on top of my mom." She related that the fact that the children might have stated that their father stabbed their mother in the stomach, even though the medical examiner did not indicate that she had been stabbed there, could have been caused by the chaos of the situation with which they were confronted. She said Patrick demonstrated the stabbing as being agitated and wild. She stated that John Robert had indicated that his father had tackled his mother "on the back." She said he used the word "tackled" at least three times. Finally, having seen the legal definition of adequate cause and sudden passion, Dr. Benedek restated her conclusion that the crime was not the result of sudden passion.

Kathy Wylie testified that she was working in an American Airlines ticket office on Wednesday, April 19, when Richardson came in using an assumed name and exchanged a New York to London ticket, scheduled to depart on that date, for another ticket leaving on April 21. She said she recognized Richardson immediately from seeing him on the news.

Mike Bosillo testified that he is a deputy chief investigator with the Dallas County District Attorney's Office. After he had a discussion with Kathy Wylie about the information she had, he contacted American Airlines and the police for the Port Authority of New York to tell them of his suspicion that Richardson was planning on using fake identification to fly from New York to London on April 21. The port authority police staked out the flight, but Richardson was not on it.

Bosillo revealed that Richardson was under electronic monitoring at the time, and he arranged to be notified immediately if there were any breach of the monitor security. He said that the name Richardson was planning to use to get to London was Robby Shane Wedeking of Stamford, Texas, who he learned was the sheriff of Jones County. According to Bosillo, after contacting Wedeking, he discovered that the sheriff had farmed land owned by relatives of Richardson. Bosillo stated that Wedeking was unaware that Richardson was using his name.

Bosillo testified that Richardson's ticket remained active after Richardson missed the flight. Using the information about Richardson's use of false identification and his attempt to flee, Bosillo obtained a warrant to rearrest Richardson. After Richardson was rearrested, Bosillo and others obtained and served a search warrant. They searched a hotel room where Richardson was living, his vehicle, and a storage shed. According to Bosillo, in Richardson's room they found the following: a sheet of notations regarding what appeared to be airline flights; over $69,000 in $100 bills; a passport and Sam's Club card containing Wedeking's name but Richardson's picture; clothing, including swimming trunks; travel books on the Caribbean; a flight coupon for the April 21 flight to London in the name of Wedeking; and identification in the name of Harris with Richardson's picture. Many of these items, including the bulk of the money, were packed in a travel bag. The Wedeking passport was not issued until April 21, the date that Richardson was supposed to have been flying from New York to London.

After the State rested, Richardson called Officer Victor Velasquez as a witness. Officer Velasquez testified that he is a police officer for the City of University Park. He indicated that he arrived at the Richardson residence just after noon on the occasion in question, entering the house just before the paramedics. He related that when he first saw Richardson, Richardson was standing over the deceased, holding his hands out with his palms up and arms open. He indicated that Richardson was not crying or sobbing, did not put his face in his hands, and was not shaking and trembling. According to Officer Velasquez, Richardson just appeared calm, with a blank stare on his face. On the other hand, Officer Velasquez related that Richardson appeared shocked to see police officers walk in and catch him over his wife's body.

Officer Velasquez testified that Richardson was slow in answering his questions, appearing to be preoccupied. He also indicated that Richardson was reluctant and hesitant to answer his questions. He related that after getting a drink of water, Richardson just slowly walked around the kitchen island and stared into the room

where the deceased was. Officer Velasquez acknowledged that he had written in his report that Richardson appeared shocked and traumatized. He insisted that Officer Ellenborg had spent the most time with Richardson at the scene.

Lee Martinson testified that he is president of ASAI, a metal distribution company based in the Dallas area. Martinson related that Richardson was the controller for the company. He indicated that Richardson was kind and considerate in his dealings with others in the business and that he was seemingly considerate with his wife. Martinson said that Richardson was nonconfrontational, and that he had never known him to be a violent person. He stated that Richardson was a person of ordinary temper.

Martinson testified that Richardson did not appear despondent when his mother was sick, that it did not impact his work in any way, and that his work did not suffer when his mother died. Martinson indicated that he was aware that Richardson's wife had filed for divorce and that Richardson did not want the divorce. He acknowledged his awareness that Richardson was upset because his wife was not continuing to work on the marriage. He said Richardson had told him that he had gone to counseling, but that his wife did not. Referring to the travel information that was found in the search, Martinson could not state what it was about his relationship with Richardson that would cause Richardson to have his work number, home number, and cell phone number written down. He acknowledged that no one else had so many numbers next to his or her name. Martinson denied knowing anything about any flight.

Rob Walters, an attorney appearing because of a subpoena, testified that he and his wife were friends of the Richardsons, having met them through their children's attendance at the Episcopal School of Dallas. He said that his wife and the deceased were close friends, and that he had come to know Richardson well through the Indian Guide program in which they and their sons were involved. He indicated that they had been in Indian Guides together for a little over a year.

Walters testified that an Indian Guide event called Derby Day was held on Saturday, the day before the murder. He characterized the event as one in which the fathers and sons were supposed to build little cars together and race them. He indicated that Richardson was present that day. Walters stated that Richardson was a considerate person. He described Richardson's personality as polite but impassive, docile, meek, maybe disengaged. He said that Richardson was not an extrovert and that he was not contentious. He indicated that temper, anger, or passion were not hallmarks of Richardson's personality.

Describing the deceased's relationship with her children, Walters testified that he did not know of another mother who was more committed to her children than the deceased. He said that he had learned a few days before Derby Day of the pending Richardson divorce. Despite that knowledge, when he saw Richardson at the event, he just casually asked him how he was doing. He indicated that Richardson answered that professionally he was doing fine, but neither he nor Richardson discussed the divorce. Walters said that there was a pregnant pause and he recognized that personally things were not fine. He stated that it was clear to him that the divorce was weighing on Richardson's mind. At the time, Walters said, it seemed most appropriate to move on to a different subject.

Walters said that he had socialized with the Richardsons a great deal and that, although the deceased would occasionally

have a glass of wine, any accusation that she had any kind of alcohol problem was scurrilous. He characterized Mary as a person who ended up organizing everyone's life. He indicated that he did not observe her criticizing, maligning, or disparaging Richardson.

Walters testified that Richardson was not loud or violent around his children, but that he would not describe him as warm and affectionate with them. He said that he was somewhat disengaged and at times uninterested. He indicated that in Indian Guides Richardson was not highly involved in the life of his son. He stated that given the brutality and senselessness of the murder, Richardson was not the kind of person that he would think would be likely to do it.

Brian Book testified that he knew Richardson through the Indian Princess program, a program for fathers and daughters. He related that his daughter used to go to school with Richardson's daughter at the Episcopal School of Dallas. Based upon his observations, Book stated that he thought Richardson's relationship with his daughter was very good. He said that as far as he knew Richardson attended all the outings of the Indian Princesses and used it to spend time with his daughter. Book also related that Richardson sometimes assisted him in coaching their children's soccer team.

Book acknowledged that he was not very familiar with the relationship between Richardson and the deceased. As to Richardson himself, Book testified that he could not recall his ever being angry. He said that Richardson was not the life of the party and "not real outgoing." He described Richardson as a quiet type and a "very evenhanded, mild-mannered type person." He stated that Richardson was friendly once one got to know him. Book acknowledged that he was not a close friend of Richardson and that he did not know what he was like in the privacy of his home.

Bill Arnold testified that he is an attorney and the husband of the deceased's sister. He said that he did not see the deceased much at a wedding reception where she was supposed to have been drunk. He said he had no idea whether she was cut off from being served alcohol at the bar. As to her being with a man named Estes, he said he did not know anyone named Estes and that he could not recall making any comment to Richardson during the reception about the man. Arnold indicated that he vaguely remembered the deceased dancing at the reception, but could not recall whether it was with Richardson or someone else. Arnold stated that Richardson told him that when his wife passed out at home after she got sick from too much to drink, he took photographs of her so that she could not deny it in the future. When asked if an intervention was planned with respect to the deceased, he said that he would call it a family meeting, not so much because of the night of the wedding reception but to try to help the marriage. He acknowledged that he organized the intervention, but that it did not go through.

Arnold characterized Richardson as the quietest man he had ever met. He related that he had tried to talk to him many times, but did not know if he knew him at all. He stated that he had lunch and breakfast with Richardson many times, and that they were in a weekly prayer group. He indicated that at his request the group prayed for a fictional couple named Bob and Patty that was really Richardson and the deceased. He said that the group probably prayed that "Bob" would have patience with "Patty," that he would love her with the love of Christ. He said that at a breakfast in March he told

Richardson that he should love the deceased as Christ would love her.

Arnold could not recall if he had told Richardson that the deceased was a woman out of control, but indicated that he was concerned about her both because of the wedding and other things that Richardson told him for which he had no verification. He acknowledged that he may have said she was out of control. Arnold said he did remember the deceased taking the children out of town on Father's Day and leaving Richardson by himself in Dallas. He said he did not know anything of Richardson hurting the deceased physically or cursing or mistreating her.

Arnold indicated that the night of the wedding reception was the only time he had ever seen the deceased have a drinking problem. He said that Richardson complained a lot to him about the deceased. He related that the deceased, on the other hand, did not feel comfortable talking to him about the marriage. He stated that he did not know if what Richardson was accused of was totally out of character.

Arnold testified that the deceased was pretty strong willed and that Richardson had told him that he could not control her. He related that his understanding was that Richardson could not make her do what he wanted her to do. Arnold said that Richardson met with him about the problems with their marriage for two and a half to three years before the murder.

Arnold testified that Richardson knew for several days ahead of time that he was supposed to move out of the house on the day of the murder. He said that Richardson had told him he did not know whether he would move out on that date. Arnold indicated that the divorce petition did not request that Richardson move out and that he was not aware of any restraining order to that effect. He related that as far as he knew there was no legal requirement that Richardson get out of the house, but that he thought Richardson had told him that was the day the deceased had asked him to move out.

Lisa Kelly testified that she is a credit manager for ASAI. She indicated that she worked with Lee Martinson, president of the company. She said that she was familiar with Richardson because he was her boss for seven months. She related that he was a good boss because he was very supportive. She also indicated that he was very kind. She stated that her opinion, based on the care Richardson gave his children when they were at a company bowling party, was that he seemed to be very involved with his children and seemed to love them very much. She acknowledged that she had only seen him interact with his children on that one occasion. Kelly described Richardson's personality as very passive and gentle and that he was easy to get along with. She said that she never saw him display any unusual temper or anger.

Kelly acknowledged that the death of his mother seemed to affect Richardson in that he would come to the office, close his door, and become extremely withdrawn. She said he spoke of her in a very loving manner during her illness prior to her death. She indicated that she had no idea what Richardson was like in the privacy of his own home.

Priscilla Hunt, Richardson's older sister, testified that Richardson was a good father and that his children enjoyed being with him. She related that he told them stories they would later repeat. She said she usually had spent Christmas Day with her mother, but Richardson and the deceased were never there on Christmas Day. She indicated that growing up she and Richardson would visit their grandparents, and

her children had visited her mother, but Richardson's children never did visit her. She also recounted an instance in which her mother wanted everyone to be present for a family portrait, but the deceased and one of the children were not there. Hunt stated that the deceased would visit her mother-in-law the first couple of years she and Richardson were married, but not thereafter.

Hunt testified that in March her mother's health began deteriorating from what was later discovered to be numerous brain tumors. She related that when her mother was admitted to Baylor Hospital in Dallas, Richardson visited her almost every day. She indicated that once her mother was actually admitted into the hospital the deceased never visited her.

Hunt testified that her mother died in July, 1999. She said that Richardson and the deceased came to the funeral, graveside service, and "celebration of life" service. She said that at the "celebration of life" service those who were at the funeral could talk about how her mother had affected people's lives. She said the deceased left the "celebration of life" service early and that Richardson had to leave early. According to Hunt, the deceased did not attend a later memorial service and "celebration of life" service held in Abilene. She indicated that Richardson had expected her to be there.

Hunt testified that both she and Richardson were devastated by their mother's death and overwhelmed because of the nature of their mother's illness. She said that in talking to him after their mother's estate sale, which he attended, she felt that he was somewhat despondent. She indicated that they had each picked out personal items to keep. She identified an overturned table in State's Exhibit 3 as one that had come from their mother's house. On cross-examination, Hunt con-

firmed that Robby Shane Wedeking had farmed land owned by her family.

Hunt testified that there was no violence in their family, that their parents got along pretty well. She said that their parents taught them to work things out when there was a problem. She agreed that violence in their home was not an option, certainly not in response to someone saying something to hurt one's feelings. Hunt acknowledged that prior to their mother's illness she had not seen Richardson very much. She said they relayed information through their mother. Hunt also acknowledged that she did not know that Richardson and the deceased had an unhappy marriage.

Hunt testified that when Richardson told her about the divorce he told her that he did not want it and did not want to separate. She said he wanted to save his marriage. She indicated that he was very, very sad and very devastated and depressed. She related that practically the day after the murder Richardson helped her find her hotel. She said at that time he never asked about the children or the deceased. She said he did not cry or sob, but was very withdrawn, almost like he was not mentally present.

Richardson, a certified public accountant, testified that he pleaded guilty to the murder so that his children would not have to testify. He said that prior to the murder he had a very good relationship with his children, being very deeply involved in their lives. He related that the deceased's brother, who was a friend from college, first introduced him to the deceased. He indicated that they had a fifteen-month courtship and a seven-month engagement. After discussing the accounting degree he received at the University of Texas, Richardson recounted that he was president of the Dallas Texas Exes in 1996.

Richardson testified that he grew up in Houston, where he attended a Church of Christ church at least three times per week. He said he loved his father and was very close to his deceased mother. He stated that prior to her death he saw her about six times per year. He indicated that during the marriage his family never spent Christmas with his mother because it was important to the deceased to spend Christmas Day with her family. He described this as awkward. He said that his mother could sense that she was imposing when she came to visit Dallas and, when she came, the deceased would never take her anywhere or do anything for her. He said the deceased did not have time for her. He related that their relationship made him sad because he loved them both.

Richardson also testified about a family photograph that his mother had made in which the deceased and one of their children had their photo cropped into the family photo because they were not there due to the fact that the deceased was not interested and chose not to go. He described his own family as one that was centered around the church, whereas the deceased's family typically gathered together on Sundays for family barbecues by the swimming pool. He also spoke of being excluded from family business meetings that the deceased's family had at Christmas.

Richardson testified that during the later years of his marriage the bad times began to outweigh the good. He indicated that he went to marital counseling, wanting to improve the marriage. He stated that, despite his efforts, the deceased would not attend the counseling.

Richardson testified that when they were first married, the deceased joined the Dallas Junior League, a service organization, and stayed active throughout the years. He related that she spent a full 40 hours per week on Junior League activities, including work outside the home three nights per week. He said he stayed home on those nights taking care of the children. He related that she would leave for a 6:00 o'clock meeting about the time he arrived home from work and that she would usually get home about 10:30 or 11:00 p.m. He indicated that she had alcohol on her breath when she got home. Later, he said, he found out that her committee would have "post-committee" meetings at a Mexican restaurant-bar.

Richardson testified that he began to be concerned about the deceased's drinking. He said that at night when she came in she would be angry at him if the children were not all asleep. He also indicated that the deceased had six good friends and that she went out for dinner and drinks with each one at least once per month. He related that she was also involved with two "Bunko" groups that involved a drinking game. He said they met once per month.

Richardson also described how the deceased got drunk at the wedding reception following her younger brother's wedding. He told of her dancing with another man. He said that although he was only ten feet away she just ignored him. He related that after the dance, instead of coming to explain to him why she was dancing with someone else, she went into a bar where she put her arms around other men and started drinking tequila shots with them. He stated that she got very drunk and that the bartender cut her off from further drinking. Later, he recalled, he saw the deceased with the man with whom she had been dancing. He said that they each had an arm around the other. He indicated that when she leaned over to whisper something to the man, he slid his hand down the back of her neck to her butt, and she did not protest. He related that, with their daughter in the car, she threw up in his truck on the way home, vomited on the

street outside their house, vomited some more in the bathroom, then passed out. Richardson said he took photographs of the vomit in the truck and of the deceased passed out so that she could not deny later the condition she had been in because she had denied such behavior in the past.

Richardson testified that Bill Arnold, the deceased's brother-in-law, initiated the idea of a family intervention to confront the deceased about her drinking, but that it did not happen because the deceased would not cooperate. Richardson indicated that he had suspicions that the deceased was having an affair. He said he and the deceased stopped having sexual relations in July 1998.

Richardson testified that if there were ever any reconciliation to a disagreement between him and the deceased it was because he compromised. He said that if they had an unresolved disagreement she would punish him by taking the children away for the weekend. He related that she would call from her cell phone late on Friday afternoons and tell him that she was en route to her family's ranch with the kids and that she did not know when she would be back. He said that on Father's Day of 1999 she was with the children on a family trip with her family. Richardson testified that whereas he wanted to take the children to church on Sundays because that was what his family had done and it was part of being a family, the deceased would come up with some imaginative idea of something else to do.

Richardson testified that he began a new job at ASAI in February 1999 that was challenging and stressful. He said that in April 1999 he was told of his mother's disorienting illness, which he later learned to be brain cancer. He told of going to see his mother, who was naked in the bathroom at the hospital and tearing things apart, and how he had quieted her down. He related that the deceased resented his visiting his mother every evening at the hospital because she was used to going out at night and leaving the children with him. He indicated that the deceased never visited his mother at the hospital. He said that when his mother died the deceased was at her family's ranch in Kerrville, where she stayed for a month.

Richardson testified that the deceased came to the funeral in Houston, but that he was not able to stay at the "celebration of life" afterwards for as long as he wanted to because she had a plane to catch. He said she indicated that she would bring the children to the memorial service in Abilene, but did not show up nor call to let him know she was not coming. He stated that he had wanted the children to be present so they would hear the nice things that were said about his mother and her life. Richardson also testified concerning how difficult it was for him to be at his mother's estate sale and see personal mementos that he had seen around as a child disappear out the door.

Richardson testified that on Labor Day 1999 the deceased took the children out of town and he was by himself. He said that the next day, when he was returning to work after coming home for lunch, the deceased told him that she was miserable and wanted him "out of here." He indicated that on a previous occasion when she had used that term she had later stated that she meant she wanted him to travel more.

According to Richardson, the next day, when the deceased again told him she wanted him out, she said she wanted a divorce. He said that the following Sunday she told him she wanted him out on Sunday, September 19, the day of the murder. Richardson testified that he visited an attorney on Monday, September 13,

who told him not to move until he told him to. Richardson stated that he never agreed to move out by September 19, emphasizing that he was not under any court order to move out by that day. Richardson stated that he paid the attorney a retainer and was reconciled to the fact that there was going to be a divorce.

Richardson recounted that at 11:00 o'clock on the morning of the murder he went to St. Michael's church because he always went to church on Sundays. He said that a great deal of tension had developed between him and the deceased that week and going to church was a nice escape to the calm, peaceful environment of the church with hymns and prayers. He remembered that he brought home the church bulletin. He related that he walked home from the church, which was four houses away from his home.

Richardson testified that as he approached the house, he saw on his front porch two tables that had belonged to his mother, including one that he had just brought back from the estate sale. He described himself as confused because he and the deceased had not discussed her moving any items out of the house. He related that he brought both tables back inside the house. He recalled that he put an oval table in the library and set his church bulletin on it. He indicated that he went and sat down with his daughter to help her with a new piano lesson she was practicing.

Richardson testified that the deceased walked into the room, looked displeased about the table he had brought back in, and motioned him over. According to Richardson, at that point the deceased leaned forward on the table and said, "Get out and get your mother's shit out," and then turned the table over. Richardson said he was beside himself because seeing her turn over the table was like watching her push his mother down the stairs. He indicated that he exploded into a rage. He stated that he had never felt such rage in his entire life. He said that he grabbed the deceased, they struggled, she slipped and fell down, and he fell on top of her.

Richardson testified that he remembered his daughter wanting to know what was going on. He said he was still in a rage like he had never been in his life. He stated that he remembered his son holding the scissors. He indicated that he thought he knocked the scissors out of his son's hand and that he remembered the blood. He recalled that the next thing he remembered was the police coming, the paramedic asking questions, and the police driving him to the police station. He said that from having seen the facts and evidence that he knew what he did and that he did it while two of his children watched. He insisted that he had not planned to kill or hurt the deceased that day. He related that if he had wanted to kill her, there were guns and knives he could have used. He stated that he could not remember what he told the police. Richardson testified that when he got to the police station he lay down on the cot bed and faced the wall, but that he did not think he went to sleep.

Richardson admitted having made the airplane reservations, saying that he was running from the pain. He said he did not know whether he really would have fled. Richardson indicated that he regretted not having moved out at the deceased's request.

Richardson denied being jealous of the deceased due to her having a better relationship with the children or due to her accomplishments. He said that her dancing with one of her brother's friends at the wedding reception hurt him, but denied that it made him furious. He denied wanting to hold the photographs of the de-

ceased passed out over her head to prevent her leaving in the future. Richardson also denied whining about not being with the children on Father's Day two years in a row. He acknowledged going through his wife's daily planner every day. He recalled coming home for lunch when he saw that she was having lunch with Sam, only to discover that Sam was a five-year-old friend of his son. He admitted that he was still suspicious of her. He acknowledged thinking about hiring a private investigator, but that he never did. Richardson also admitted looking through the deceased's checkbook.

Richardson said he was not furious about the divorce when he talked to the deceased's mother before the murder, only concerned. He acknowledged that he asked her if she had "blessed off" on the deceased's decision. He remembered telling the deceased's sister that he was concerned for the children and "the stigma they would have to grow up." [sic]

When asked why, if the fact that he was supposed to be moving out on the day of the murder was not bothering him, he mentioned it to Nathaniel Williams as soon as he walked in the door, Richardson said that he was stunned that his mother-in-law would have sent new furniture knowing that he was moving out. He said it was kind of like he was a piece of furniture. He said it was up to the jury to decide if he were telling the truth about what happened that day. He denied that his response to his wife, as he was killing her, "Why are you doing this to me?," was related to his moving out or to the divorce. Instead, he insisted, it related to her comment about his mother. He denied jumping over a couch or tackling the deceased. He said that he did not remember hitting the deceased in the mouth and was oblivious to choking her. He indicated that he could not recall the screaming that was on the 911 tape.

Richardson said that he did not remember getting the lamp and wrapping the cord around the deceased's neck and that he did not remember how long it was that he strangled her with the cord. He also denied remembering how he got the lamp cord from around her neck. He said he did not know how he got his wife's head severed with the scissors, that he just remembered blood.

When Richardson was asked if he would have killed the children next if the police and paramedics had not arrived, Richardson answered, "I mean, there's certainly more emotions between my wife and me than there were my children, and a lot more emotions that had been accumulated over the years, emotions that had been stored up and unexpressed."

Richardson testified in some detail about the careful planning he had made to escape to Europe or the Caribbean. When asked what punishment he deserved for what he did, Richardson testified, "I deserve whatever the jury decides." He repeated this answer when asked if he deserved life. Later, in response to the same question, he said, "It's up to the jury. I accept whatever they decide."

At the punishment hearing of a murder trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX. PEN. CODE ANN. § 19.02(d) (Vernon 1994). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree. *Id.* "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. TEX. PEN. CODE ANN.

§ 19.02(a)(1) (Vernon 1994). "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation. TEX. PEN. CODE ANN. § 19.02(a)(2) (Vernon 1994).

We hold that the jury's verdict is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. In arguing that the verdict is against the great weight and preponderance of the evidence, Richardson refers us to the testimony about the divorce and the death of his mother, as well as his own testimony about the comment the deceased made concerning his mother. The jury could easily have determined from the evidence that Richardson was resentful about his wife as a result of numerous things over the years, including the divorce and his wife's treatment of his mother, and that any passion arising as a result of any or all of these things was not sudden, but had been building up over time. As to the comment that Richardson claims that the deceased made about his mother, the jury could have reasonably concluded that this was not an adequate cause. We also note that the jury was not required to accept Richardson's version of the facts. *Melton v. State,* 367 S.W.2d 678, 679 (Tex.Crim. App.1963). That being the case, the jury could have determined that the deceased made no such comment and that she did not turn over the table. While there was evidence that the table had been overturned, it was not necessary to conclude that it was the deceased who overturned it or that it was overturned in the manner described by Richardson. Richardson asks us to compare the facts in this case with those in *Naasz v. State,* 974 S.W.2d 418, 424–26 (Tex.App.—Dallas 1998, pet. ref'd). We have done so and find that the opinion in that case is consistent with and

supports our opinion. We overrule Richardson's issue one.

## TESTIMONY CONCERNING ULTIMATE ISSUE

■ Richardson urges in issue two that the trial court erred in admitting into evidence the psychiatrist's opinion "that did not merely embrace the ultimate issue but decided it." Dr. Benedek was asked outside the presence of the jury what her opinion was as to whether this offense resulted from sudden passion arising from an adequate cause. Richardson objected to her answering the question, arguing that Rule 704 allows a witness to testify as to certain opinions that embrace an ultimate issue, but does not allow a witness to testify to the ultimate issue.

When Dr. Benedek was asked the same question before the jury, Richardson reurged his prior objection based on Rule 704, referring to it as "ultimate issue decision opinion testimony by this witness." Subsequently, when Dr. Benedek was asked the question again after she had reviewed the legal definitions of the terms in the question, Richardson objected on the basis of Rules 704, 705, and 702.

On appeal, Richardson argues that Dr. Benedek's testimony did not merely embrace the ultimate issue but decided it for the jury. Rule 704 of the Texas Rules of Evidence provides that testimony in the form of an opinion or inference otherwise admissible is not inadmissible because it embraces an ultimate issue to be decided by the trier of fact. TEX. R. EVID. 704. The question asked of Dr. Benedek embraced the ultimate issue to be decided but did not answer the ultimate issue for the jury. If it is Richardson's contention on appeal that Dr. Benedek's answer was objectionable because she sought to decide the ultimate issue for the jury rather than

merely answering the question that embraced the ultimate issue, we note that he made no objection to her answer on that basis.

Richardson relies upon *Duckett v. State*, 797 S.W.2d 906 (Tex.Crim.App.1990). In that case the court held that while testimony merely embracing an issue is admissible under Rule 704, allowing an expert to give an opinion as to whether a child molestation witness was telling the truth or could be believed would cross the line of assisting the trier of fact to replace that body as the decision maker. *Id.* at 914. The court did not suggest that asking a question, such as the one in this case, that embraces an ultimate issue, or the answering of such a question, is inadmissible because it replaces the trier of fact as the decision maker. We do not find *Duckett* to be inconsistent with our opinion. We overrule issue two.

## HEARSAY—DR. ELISSA P. BENEDEK

■ Richardson insists in issue three that the trial court erred by allowing Dr. Benedek to testify over a hearsay objection that one of the reasons the murder occurred was because of jealousy and jealousy with regard to money. She testified that her opinion was based in part on statements to her by one of the children that his father was jealous of his mother, that his mother had more money, about $2000 more. Richardson objected that Dr. Benedek's opinion testimony as to the cause of the murder constituted inadmissible hearsay. Rule 703 of the Texas Rules of Evidence provides that the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing, and that if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Consequently, if Dr. Benedek's testimony was objectionable, it would not have been that it was based upon hearsay, because hearsay testimony may form the basis of an expert's opinion. Rather, if it were objectionable it would have been that the facts or data she relied upon were not of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject. Richardson never made any objection on such a basis, nor was any suggestion made that the facts or data Dr. Benedek was relying upon were not of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject. We find that nothing is preserved with respect to this issue. We overrule issue three.

■ Richardson argues in issue four that the trial court erred by allowing Dr. Benedek to testify, over a hearsay objection, as to hearsay statements made by one of the children who witnessed the incident. After defense counsel had questioned Dr. Benedek about her notes with respect to one of the children, the prosecutor asked her whether, on the front page of her statements, another of the children expressed to her how his mother got on the floor. She answered, "He says my daddy tackled her." At that point Richardson objected on the basis of hearsay, and the trial court overruled the objection. The prosecutor then asked Dr. Benedek how the child said she got on the floor. Richardson presented no objection to that question. Dr. Benedek answered, "He then said, 'My daddy tackled her. I saw that he tackled her on the back.'" When the prosecutor asked Dr. Benedek how many times the child mentioned the word "tackled" on a single page of her notes, it appears that counsel may have risen to

object, because the trial court said, "I've made my ruling, Counselor." Dr. Benedek then replied, "At least three times."

We agree with Richardson that his initial objection based upon hearsay should have been sustained. However, the same testimony was received immediately thereafter without objection. The trial court's overruling of an objection to evidence will generally not result in reversal when other such evidence is received without objection. *Leday v. State,* 983 S.W.2d 713, 716–17 (Tex.Crim.App.1998). We overrule issue four.

### HEARSAY—ROBERT WILLIAMS

Richardson submits in issue five that the trial court erred by allowing the deceased's brother to testify as to harmful hearsay statements made by the deceased against him. Robert Williams, the deceased's brother, was asked whether the deceased told him, when they had lunch the Thursday before the murder, how she was currently feeling. He replied, "You could see it in her face that she was under a lot of stress." Richardson made a hearsay objection; the State argued that it was admissible under the "then existing mental condition" set out in the rules of evidence. The trial court overruled the objection. Williams then continued his answer without further question, testifying that his sister's main concern was what Richardson would do to her and the kids after the divorce. Richardson again presented a hearsay objection that the trial court overruled.

Richardson presented another hearsay objection when Williams was asked whether the deceased had told him how she was feeling about Richardson. The trial court overruled the objection. During his answer to the question, Williams testified that the deceased had told him Richardson was a monster. Richardson posed no ob-

jection to Williams's answer making reference to the deceased's statement about his being a monster.

The prosecutor then asked Williams if the deceased had told him how she was feeling or whether she was feeling any concern or fear about Richardson. After Williams had answered, "Yes," Richardson presented another hearsay objection that the trial court overruled. Without there being another question, Williams testified that the deceased had told him that Richardson was a very manipulative, scheming person. He related that she felt like she was being followed and felt that Richardson might be taping her calls. Richardson presented no objection to this testimony by Williams.

When the prosecutor asked Williams how the deceased felt about her personal belongings, Richardson presented yet another hearsay objection that the trial court overruled. Williams answered that the deceased was worried about Richardson going through her stuff at home. Without objection, the prosecutor asked Williams if he was referring to her Day–Timer calendar. He replied, "Her Day–Timer, things like that." When Williams started to say, "He had confronted her—," the trial court sustained Richardson's objection that the testimony was nonresponsive, while again overruling a hearsay objection.

■ We will first consider the admission of Williams's testimony that his sister's main concern was what Richardson would do to her and the kids after the divorce. The answer was in response to a question as to how she was currently feeling on the Thursday before the murder. The State suggests that this testimony was admissible under the "Then Existing Mental, Emotional, or Physical Condition" exception to the hearsay rule, an exception set forth in Rule 803(3) of the Texas Rules of

Evidence. That rule provides that the exception does not include, except under circumstances inapplicable here, a statement of belief to prove the fact believed. In this instance the testimony showed the deceased's belief that Richardson was capable of harming the deceased or their children, and it was offered to prove the truth of that belief. When the defendant's statement suggests an intent or future conduct by someone else, it goes beyond the state of mind exception of Rule 803(3) and should not be admitted. *Wilks v. State,* 983 S.W.2d 863 (Tex.App.—Corpus Christi 1998, no pet.). Consequently, the trial court abused its discretion in overruling Richardson's hearsay objection to this testimony. .

Despite the holding in *Wilks* to which we have just referred, the State relies upon it in arguing that the trial court did not abuse its discretion in overruling Richardson's objection. We find that the holding in *Wilks* upon which the State relies is distinguishable. In *Wilks,* Harold Wilks was convicted of killing his wife Virginia after she refused to sign her consent to change the beneficiary on his individual retirement account. *Id.* at 865. Upon refusing to sign, Virginia said, "Well, he'll have to kill me first, I'm not signing it." Wilks objected to this testimony on the basis of hearsay. The court correctly held that this statement did not relate to any intent on Harold's part to kill Virginia but to the strength of Virginia's intention not to sign the change of beneficiary form. *Id.* at 866. The court held that the trial court did not abuse its discretion in admitting the statement because it showed her present state of mind as authorized by Rule 803(3). *Id.* As we have already noted, in this case the statement made by the deceased was not merely an expression of her state of mind but was a statement of her belief that Richardson was capable of harming her or their children.

Admission of hearsay evidence against a criminal defendant implicates the Confrontation Clause of the Sixth Amendment of the United States Constitution because the defendant is not afforded the opportunity to confront the out-of-court declarant. *Guidry v. State,* 9 S.W.3d 133, 149 (Tex. Crim.App.1999). That being the case, our harmless error review is governed by Rule 44.2(a) of the Texas Rules of Appellate Procedure. *Id.* at 151. Given all of the evidence of this case, including the fact that it is undisputed that Richardson brutally murdered the deceased in front of their children, we hold beyond a reasonable doubt that any error in admission of the deceased's concern as to what Richardson might do to her and the children did not contribute either to his conviction or his punishment.

■ We next consider the admission of the deceased's statement to Williams that Richardson was a "monster." Williams was asked whether the deceased had told him how she was feeling about Richardson. As noted, the trial court overruled Richardson's hearsay objection. The trial court did not abuse its discretion in that ruling because the question did not necessarily call for a hearsay response outside the exception outlined in Rule 803(3). Richardson made no objection when Williams answered the question by saying that the deceased had told him that Richardson was a monster. Consequently, no error is preserved with respect to this testimony. TEX. R. APP. P. 33.1(a)(1).

■ Richardson refers to Williams's testimony that the deceased told him that Richardson was a very manipulative, scheming person, that she thought she was being followed, and that she felt that Richardson might be taping her calls. The prosecutor asked Williams if the deceased had told him how she was feeling or

whether she was feeling any concern or fear about Richardson. After Williams had answered, "Yes," Richardson presented a hearsay objection. If a question calls for an objectionable response, a defendant should make an objection before the witness responds. *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex.Crim.App.1995). If the defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived. *Id.* Inasmuch as Richardson did not object to the question until after it had been answered and has failed to show any legitimate reason to justify the delay, any error was waived. When Williams testified that the deceased had told him that Richardson was a very manipulative, scheming person, that she was being followed, and that she felt Richardson might be taping her calls, Richardson presented no objection. We hold that nothing is presented for review with respect to this testimony. TEX. R. APP. P. 33.1(a)(1).

■ Finally, Richardson complains of Williams's testimony that the deceased told him that she was worried about Richardson going through her stuff at home, including her Day–Timer calendar. When the prosecutor asked Williams how the deceased felt about her personal belongings, Richardson presented a hearsay objection that the trial court overruled. The trial court did not abuse its discretion its discretion in overruling Richardson's objection because the question did not necessarily call for objectionable testimony, since the answer could have been admissible as an exception to the hearsay rule, Rule 803(3). Richardson made no objection when Williams answered that the deceased was worried about Richardson going through her stuff at home. Richardson made no objection when the

prosecutor asked Williams if he were referring to the deceased's Day–Timer calendar. Williams answered, "Her Day–Timer, things like that," then started to say, "He had confronted her—" At that point the trial court sustained Richardson's objection that the testimony was nonresponsive and overruled yet another hearsay objection. The trial court did not abuse its discretion in overruling the hearsay objection because it was untimely. We hold that nothing is presented for review with respect to this testimony. We overrule issue five.

## FLIGHT

■ Richardson urges in issue six that the trial court erred in admitting into evidence the extensive prejudicial testimony concerning his intended flight. Richardson objected to flight testimony on the basis that it was not relevant because he was pleading guilty and therefore it would not go to establish his consciousness of guilt and on the basis that its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The trial court ruled that such evidence would be admissible. In view of Richardson filing what is styled as an application for probation, his ability to follow the law and respect the conditions of community supervision was at issue. We therefore hold that his efforts to flee the country while on bond were highly relevant to the punishment issue and that its admission did not result in any unfair prejudice to Richardson. We overrule issue six.

## RECUSAL

■ Richardson argues in issue seven that the trial court erred by denying his motion to recuse. He alleged that the trial judge should be recused because his impartiality might reasonably be ques-

tioned or because he had a personal bias or prejudice concerning the subject matter or a party. He alleged that the deceased and the judge's wife were close friends, both belonging to the Dallas Junior League, and that the deceased had been a strong supporter of the judge's wife, herself a judge, in her last election, and that the judge had declared his bond insufficient and raised it from $30,000 to $1,000,000 without proper notice to him and without a hearing, despite Richardson having made every required appearance. Richardson must show that the trial court abused its discretion by denying the motion. *Kemp v. State,* 846 S.W.2d 289, 306 (Tex.Crim.App.1992). We may not reverse a trial court where the trial court's ruling on the motion was within the zone of reasonable disagreement. *Id.* In making our abuse of discretion analysis, we consider the totality of the evidence at the hearing on the motion. *Id.*

The presiding judge of the First Administrative Region presided at the motion to recuse. Connie O'Neil, who recently had been president of the Junior League of Dallas, a volunteer organization of approximately 5600 members, testified that both the deceased and the judge's wife were members of the League and members of its leadership council. She indicated that the council, which consisted of 40–42 members, met seven or eight times between June 1, 1998, to May 31, 1999. While O'Neil could not say how many of those meetings were attended by the deceased and Judge Kristin Wade, the judge's wife, she testified that they worked together during those meetings on at least a few occasions. She characterized the meetings, which would last from forty-five minutes to as long as an hour and a half, as more a presentation and agenda than a gathering where everyone would visit with everyone else. O'Neil related that the deceased and Judge Kristin Wade did not

serve on any other committee. The League president described both the deceased and Judge Kristin Wade as active members of the League. O'Neil also testified that on December 6, 1998, both Judge Henry Wade, Jr., the trial judge, and his wife and Richardson and the deceased had attended a party at her home. O'Neil identified several women as members or former members of the Junior League of Dallas.

Judge Kristin Wade testified that she had known the deceased through the Junior League of Dallas, and that they both had served on the leadership council during the prior club year. She indicated that she would classify the deceased as more of an acquaintance than a friend. She said they knew each other by sight and exchanged pleasantries when they saw each other. She related that they did not engage in personal conversation, but definitely engaged in Junior–League type conversation. She stated that she did not know such personal details as the number or names of the Richardson children. She acknowledged having talked to the deceased on occasions other than leadership council meetings and that their relationship was a little more than someone meeting for the first couple of times. She testified that she and the deceased attended most of the meetings of the leadership council. She acknowledged that because of the group's size it was sometimes hard to keep track as to who was there. Judge Kristin Wade testified that she recalled the deceased having been at the December 1998 party at the home of Connie O'Neil, and that although she could not recall Richardson being there, he probably was and it was likely that both she and her husband met him.

Judge Kristin Wade testified that a member of the Junior League called her the evening of the murder, telling her of

the death and saying that she thought Richardson killed her. She related that at the time of the call, her husband, Judge Henry Wade, Jr., asked who had called, but she was too busy putting their children to bed to answer. She later told him that she had received a call from a friend informing her that another girl she knew had been killed. When her husband asked if he knew the deceased, she told him her name, but he again asked whether he knew her. Judge Kristin Wade indicated that she told him she did not know if he did or not. She stated that after seeing pictures of the deceased on the evening news, her husband stated that he did not recognize her. She acknowledged that she recognized the deceased.

Judge Kristin Wade testified she received several phone calls the next day after Richardson was released on bond, all from members of the Junior League. She related that the callers were unhappy, wanting to know how a bond works, how bond is set. She indicated that she might also have received calls the following day. She remembered that Connie O'Neil, the immediate past president of the Junior League, had called her at some point about the case. She recalled a total of about five or six calls. She said it would be a fair assessment that the callers were upset that Richardson was out on bond.

Judge Kristin Wade testified that on Monday, before getting the calls, while on their way to work, she asked her husband what he thought about the bond and he thought that the information on the news might have been incorrect in that it could have been a cash bond instead of a surety bond. She denied that they discussed whether the bond amount was set too high or too low.

Judge Kristin Wade testified that her husband had been in attendance with her at Junior League functions to which spouses were invited. She indicated that there were only one or two such events per year.

Judge Kristin Wade acknowledged that on Monday, the day after the murder, she contacted Judge King, the judge who had set Richardson's bond, and Ms. Dyer, an assistant district attorney, concerning the bond. She said both contacts were in the nature of seeking information so that she could accurately answer the callers' questions and know where to refer them. She acknowledged that she was trying to direct her friends who were upset about the bond to Ms. Dyer so she could file a motion to raise the bond if she chose to do so. She insisted that Ms. Dyer had already filed such a motion at the time she talked to her. She again acknowledged that some of the callers were outraged about the bond.

Judge Kristin Wade acknowledged that she attended the deceased's funeral, which she indicated was attended by a lot of people, including members of the Junior League. She also indicated that the previous evening she had told her husband of her plans to attend the funeral. She related that she attended a reception after the funeral at the headquarters of the Junior League. She stated that the general consensus of those with whom she talked there was that they were outraged that Richardson was out on bond. She recalled having spoken with O'Neil and two others. She subsequently testified that she did not really know that there was much conversation about the bond at the reception. She affirmed the fact that her husband knew from the news that there were some people outraged about the amount of the bond. She acknowledged that her husband was aware that she had attended both the funeral and the reception.

Judge Kristin Wade testified that she disagreed with the amount of the bond Judge King set, but that she did not relate that to him. She indicated that she and

her husband did not ride together to work on the day the case was assigned to him. She related that she thought her husband already knew, before he was assigned to the case, that the State had already filed a motion to raise the bond.

Judge Kristin Wade acknowledged that several of those previously identified by O'Neil as being affiliated with the Junior League had made contributions to her March 1998 primary election campaign. She denied that any of them were among those who had called her. She said that she did not recall one of her campaign signs having been in the Richardsons' yard, but that she would not be surprised if one had been there.

Judge Kristin Wade insisted that after the case was assigned to her husband she called Junior League headquarters and talked "to Connie O'Neil and/or Helen Holman," telling them not to call her and not to have anyone else call her because she could not talk about the case anymore. She indicated that she received no more angry phone calls after that.

Judge Kristin Wade insisted that she only knew the deceased through the Junior League; that they had never been in each other's homes; that she had never had lunch with the deceased; and that she did not know the number or names of the deceased's children. She related that neighbors also asked her about the bond because of all the publicity about it. She said that she tried to distance herself from her husband regarding the case. She said she had received campaign contributions from people who were not in the Junior League, and that the deceased, to her knowledge, had not contributed to either her or her husband's campaign. She acknowledged that someone could contribute to a campaign in non-monetary ways, such as having a yard sign in their yard. She said that she did not think that she had

ever discussed with her husband that their neighbors were unhappy with the bond situation.

Judge Henry Wade, Jr., the trial judge, testified that he is the husband of Judge Kristin Wade. He indicated that on the night of the murder he learned from his wife of the murder and that the deceased had been a member of the Junior League. He said that he learned, before the case was assigned to him, that his wife had received calls from someone in the Junior League who was unhappy about the bond situation. He related that he might have met the Richardsons at the party at the home of O'Neil, but that he did not recall it. He denied knowing any of the deceased's family. He said he was aware that his wife knew the deceased through the Junior League, but was not aware that it was through the leadership council.

Judge Henry Wade, Jr. testified that he was aware that his wife had attended both the funeral and the reception and he that he recalled a conversation that occurred before he took over the case about someone in the Junior League being unhappy about the bond. He indicated that he was "kind of" aware that it was more than one person, although he was not aware of specific names. He related that when Ms. Dyer presented him with a motion to raise the bond prior to the case being assigned to him, as a matter of courtesy he discussed the matter with Judge King as to what he should do and they agreed he would do nothing. He acknowledged having seen press reports concerning public outrage about the amount of the bond. He said that his wife let him know she disagreed with the amount of the bond. He acknowledged that the morning the case was assigned to him he granted a State's motion to declare Richardson's bond insufficient and raised it from $30,000 to $1,000,000, in the absence of Richardson's

attorney and without a hearing, although he knew Richardson was represented by counsel. He related that it was represented to him that a copy of the motion had been faxed to Richardson's attorney.

Judge Henry Wade, Jr. testified that he only knew his wife's Junior League friends casually. He said he did not know the deceased, was not a friend of hers or of Richardson, and the fact that the deceased and his wife had both been members of the Junior League would not influence his decision in the case.

In summary, the undisputed evidence included the following:

1. Judge Kristin Wade, wife of the trial judge, is a member of the Junior League of Dallas.

2. Judge Kristin Wade served on the leadership council of the Junior League with the deceased, a group that consisted of approximately 40–42 members, which had met approximately 7–8 times. .

3. After Richardson's bond was set at $30,000, several members of the Junior League called Judge Kristin Wade. In general, the callers were outraged that Richardson was out on bond.

4. At some point Judge Kristin Wade expressed to her husband, the trial judge, her personal disapproval of the amount of Richardson's bond.

5. On the day after the murder, Judge Kristin Wade contacted the judge who set the bond and an assistant district attorney involved in the case and discussed the bond with them.

6. Judge Kristin Wade attended the deceased's funeral and a reception following at the headquarters of the Junior League. While at first Judge Kristin Wade testified that the general consensus of those at the reception was outrage that Richardson was out on bond, she later

testified that, "I really don't know that there was much bond conversation at all at that particular reception." One of those to whom she spoke at the reception was O'Neil, the Junior League's immediate past president.

7. Prior to the case having been assigned to him, Judge Henry Wade, Jr. knew of the phone calls his wife had received from friends who were unhappy about the situation relating to Richardson's bond. .

8. Judge Henry Wade, Jr. knew that his wife knew the deceased through the Junior League and that she had attended both the funeral and the reception.

9. The district attorney's office presented a motion to raise Richardson's bond to Judge Henry Wade, Jr. prior to the case having been assigned to him.

10. The morning that the case was assigned to him, Judge Henry Wade, Jr. raised the amount of Richardson's bond from $30,000 to $1,000,000 without a hearing and in the absence of Richardson's counsel.

■ One of the bases for Richardson's motion was that Judge Henry Wade, Jr. should be recused because his impartiality might reasonably be questioned. The trial court's duty was to determine whether the movant had provided facts sufficient to establish that a reasonable member of the public at large, knowing all the facts involved in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial. *Sears v. Nueces County*, 28 S.W.3d 611, 615 (Tex.App.—Corpus Christi 2000, no pet.).

We hold that when the totality of the evidence is considered, Richardson has produced undisputed evidence that would show that a reasonable member of the public, knowing all the circumstances in-

volved, would have questions or doubts as to the impartiality of the trial judge. We therefore hold that the trial court's denial of Richardson's motion to recuse is an abuse of discretion because it is outside the range of reasonable disagreement.

The State, in urging that the trial court did not abuse its discretion by denying Richardson's motion to recuse, refers us to the testimony that we have already related, including testimony from Judge Kristin Wade that she did not have a close relationship with the deceased; that she had distanced herself from the case once it had been assigned to her husband; Judge Henry Wade, Jr.'s testimony that he would not be influenced by the fact the deceased and his wife were in the Junior League together; and Judge Henry Wade, Jr.'s testimony that he did not call a hearing on the State's motion to raise the amount of Richardson's bond because he was not required to. Assuming all of this testimony to be true, the undisputed evidence still presents a factual situation in which, if he or she knew all the circumstances, a reasonable person would have questions or doubts about the judge's impartiality.

The State also argues that the trial court did not abuse its discretion because Richardson failed to show any bias, prejudice, or partiality on the part of Judge Henry Wade, Jr. As we have previously noted, Richardson did not have the burden to show bias, prejudice, or partiality on the part of Judge Henry Wade, Jr. Rather, he was required to produce facts sufficient to establish that a reasonable member of the public, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial. The difference is well-described in some detail in an article by Judge Charles Bleil and Carol King entitled "Focus on Judicial Recusal: a Clearing Picture." Bleil, Charles and King, Carol, *Focus on Judicial Recusal: a Clearing Picture,* 25 TEX. TECH L. REV. 773 (1994). Our opinion does not constitute a finding that there was any actual bias, prejudice, or partiality on the part of Judge Henry Wade, Jr.

The State relies on *Kemp,* 846 S.W.2d at 306. We find that case to be distinguishable. In *Kemp,* the defendant sought to recuse the trial judge on the basis that his failure to recuse would constitute a violation of the Texas Code of Judicial Conduct and that the trial judge was constitutionally disqualified due to bias because he had signed his initial search and arrest warrants. *Id.* at 304–05. On appeal, the court held that violation of the Code of Judicial Conduct is not necessarily a ground for reversal and that, in any event, the code provision relied upon by the appellant had been deleted. *Id.* at 305. The court also held that the mere fact that the trial judge had made a ruling at one stage of the proceeding does not make the judge partial with respect to a later ruling in the case. *Id.* at 306. In the case at bar, Richardson neither relies on the Texas Code of Judicial Conduct, nor does he solely rely on the issue of bias on the part of the trial judge. Rather, he asserts that, under these facts, the trial judge's impartiality might reasonably be questioned.

A case more nearly on point is the recent case of *Woodruff v. Wright,* 51 S.W.3d 727, 738 (Tex.App.—Texarkana 2001, pet. denied). In that case the evidence showed that the judge had performed a wedding ceremony for a party and the party had performed heart surgery on the judge's mother. *Id.* at 736–37. The court, in holding that the trial court did not abuse its discretion in denying a motion to recuse, held that recusal is not required merely because the trial judge is acquainted with a defendant, nor is it required where the party, who was for some time

the only heart surgeon in the region, had performed surgery on a family member of the judge. *Id.* at 737. We hold that case to be distinguishable as well because in the case at bar the record reflects more evidence raising a reasonable doubt of the trial judge's impartiality than merely an acquaintanceship of the deceased with the judge's wife. We agree with the holding in *Woodruff* and do not find it to be inconsistent with this opinion.

Having found that the trial court abused its discretion by denying Richardson's motion to recuse, we next consider whether the error affected Richardson's substantial rights, or, if the error be deemed constitutional, whether the error, beyond a reasonable doubt, contributed to Richardson's conviction or punishment. TEX. R. APP. P. 44.2. Considering the totality of the record, including the fact that the jury assessed Richardson's punishment; the severity of the crime which he committed; and the lack of any showing that the judge did anything during the punishment hearing indicating bias or partiality, we hold that Richardson's substantive rights were not affected, and we further hold, beyond a reasonable doubt, that any error in denying his motion to recuse *did not contribute* either to his conviction or punishment. Richardson makes no argument that he was harmed and presents no authority with respect to harm. We overrule issue seven.

## VOIR DIRE

■ Richardson urges in issue eight that he was denied the effective assistance of counsel when the trial court prohibited his attorney from asking the jury which jurors would require an additional fact such as mercy killing before they could consider assessing probation and subsequently not allowing his attorney to identify those jurors who raised their

hands before the trial court sustained the State's objection to the question. A prospective juror must be able to consider the full range of punishment for the offense generally, not for some specific manner or means of committing the offense. *Johnson v. State*, 982 S.W.2d 403, 405 (Tex. Crim.App.1998). A hypothetical question seeking to commit the jurors to a particular set of facts is an improper question. *Atkins v. State*, 951 S.W.2d 787, 789 (Tex. Crim.App.1997). The question posed by defense counsel was not a proper question because it sought to commit the jurors to a particular set of facts. Consequently, the trial court did not err by sustaining the State's objection to the question.

Richardson argues that his counsel was not attempting to commit the jurors to specific facts in the case but attempting to determine whether they could follow the law requiring them to be able to consider the full range of punishment. We disagree. The jury was required to consider the full range of punishment generally with respect to murder. A "no" answer to Richardson's question, however, would have committed the jury to consider probation in a non-mercy killing case, which was something that they were not obligated to do. We hold that the trial court did not err in prohibiting this question because it sought to commit the jurors to specific facts in the case. We overrule issue eight.

## VICTIM IMPACT TESTIMONY

■ Richardson complains in issue nine that the trial court erred by admitting victim impact testimony with respect to his children. Prior to testimony by Dr. Benedek, Richardson objected to victim impact testimony on the basis that the deceased, not the children, was the only victim insofar as victim impact testimony was concerned and because its probative value was substantially outweighed by the

danger of unfair prejudice. After the trial court overruled Richardson's objection, Dr. Benedek testified as to a range of problems that the children might experience as a result of the trauma surrounding their mother's death and predicted that they would suffer from the effects of witnessing the murder for the rest of their lives. Victim impact testimony concerning the effect of the offense upon the victim's family is admissible. *Stavinoha v. State,* 808 S.W.2d 76, 79 (Tex.Crim.App.1991). Dr. Benedek's testimony was highly relevant to that issue and was not unfairly prejudicial. We hold, therefore, that the probative value of her testimony was not substantially outweighed by the danger of unfair prejudice.

Richardson relies on the cases of *Cantu v. State,* 939 S.W.2d 627 (Tex.Crim.App. 1997) and *Boston v. State,* 965 S.W.2d 546 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd). In each of those cases the court held that victim impact testimony with respect to extraneous offenses is inadmissible. *Cantu,* 939 S.W.2d at 637; *Boston,* 965 S.W.2d at 551. Neither case held that victim impact testimony with respect to family members of the victim named in the indictment for which the defendant was tried is inadmissible. We therefore find that these cases are distinguishable and are not inconsistent with this opinion. We overrule issue nine.

## JURY MISCONDUCT

Richardson insists in issue ten that the trial court erred by overruling his motion for new trial because he established that the jury had received "other evidence" during its deliberations that constituted an "outside influence" and because the jury engaged in jury misconduct resulting in the denial of a fair and impartial trial. In his motion for new trial, Richardson urged that the jury received "other evidence" that constituted an "outside influence" that was brought to bear in that the jury considered the application of the parole laws to his case, contrary to the jury instructions in the charge. Richardson asserted in the motion that in an affidavit attached to the motion a juror stated that the amount of time that Richardson would be required to serve was discussed and that those figures were put on a blackboard. We have examined the affidavit in question and find that, while the juror indicated that he changed his mind from a lesser punishment to agree with the other jurors on a sentence of sixty years, following a discussion concerning the parole laws and the effects of the parole laws, the affidavit, although indicating that figures of terms of years and parole eligibility were placed on a blackboard, contains no allegation that the amount of time Richardson would be required to serve was discussed and that those figures were put on a blackboard. We note, however, that the affidavit of one of Richardson's attorneys indicates that the juror related to him that the jurors discussed the parole laws as well as the effect on the amount of time Richardson could be incarcerated.

Rule 606(b) of the Texas Rules of evidence provides that upon an inquiry into the validity of a jury's verdict a juror may not testify as to any matter or statement occurring during the jury's deliberations or to the effect of anything on any juror's mind or emotions or mental processes as influencing any juror's assent to or dissent from the jury's verdict. TEX. R. EVID. 606(b). The rule further provides that a juror's affidavit concerning such matters would not be admitted into evidence for any of those purposes. *Id.* The rule does provide that a juror may testify as to whether any outside influence was improperly brought to bear upon any juror.

A juror's discussion about the application of the parole law to the defen-

dant's sentence does not constitute an outside influence. *Hines v. State*, 3 S.W.3d 618, 623 (Tex.App.-Texarkana 1999, pet. ref'd). Inasmuch as the testimony Richardson sought to present in support of his motion was testimony concerning the jurors' deliberations that did not constitute an outside influence, the trial court did not err in overruling his motion for new trial. We overrule issue ten.

Richardson insists in issues eleven and twelve that Rule 606(b) of the Texas Rules of Evidence, as applied, constitutes a violation of his right to trial by jury as mandated by article I, section 15, of the Texas Constitution and of his right to a fair and impartial jury as provided by the Sixth Amendment of the United States Constitution. Rule 606(b) of the Texas Rules of Evidence, as applied, does not constitute a violation of Richardson's right to trial by jury as mandated by article I, section 15 of the Texas Constitution nor of his right to a fair and impartial jury as provided by the Sixth Amendment of the United States Constitution. *Hines v. State*, 3 S.W.3d at 622–23; *Sanders v. State*, 1 S.W.3d 885, 888 (Tex.App.—Austin 1999, no pet.). We overrule issues eleven and twelve.

The judgment is affirmed.