NO. 07-05-0061-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

NOVEMBER 21, 2006
_____

EDMOND WAITES, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_____

FROM THE 27TH DISTRICT COURT OF BELL COUNTY;

NO. 52925; HONORABLE MARTHA J. TRUDO, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**MEMORANDUM OPINION**

Following a plea of not guilty, appellant Edmond Waites was convicted by a jury of murder and sentenced to sixty years confinement. Presenting two issues, he maintains (1) the evidence is factually insufficient to support a negative finding on a punishment "affirmative defense," and (2) the punishment charge was fundamentally defective for failing to instruct the jury on the law as contained in article 38.36 of the Texas Code of Criminal Procedure. We affirm.

Appellant and his wife, Terri, had a brief and tumultuous relationship that culminated in her death. After meeting on the internet, they began dating in the spring of 2001, when both were nineteen years old. According to testimony, they married on either August 31 or September 1 of that year. Law enforcement officers were dispatched to their residence in Killeen on three occasions on October 21. The first and second responses were domestic disturbance calls involving a dispute over ownership of a computer. Appellant wanted a divorce, and Terri was resisting, but there was no physical altercation. On the third occasion, officers were dispatched in response to a 9-1-1 call placed by appellant, who confessed to killing Terri.

When officers arrived, they observed appellant's car backed up to the front door of the residence. Appellant had his hands on his head and posed no threat. He was placed in a patrol car, read his rights, and transported to jail. Detectives began processing the crime scene. Terri's body was on the floor, lying partially on a blanket a few feet inside the front door. According to a paramedic, the body was face down and rigor mortis had set in. Garbage bags covered Terri's head and her legs. Her bagged legs were positioned inside a duffle bag. She was topless and her body was covered in blood. One of the investigating officers detected the smell of bleach throughout the apartment.

Dr. Lynn Salzberger, the medical examiner who performed the autopsy, testified that Terri died from homicidal violence including strangulation and sharp force injuries. Salzberger described the factors that indicated strangulation, which included indications of burst capillaries on her face, eyes and heart, bruises on the neck and thyroid gland, and a severely bruised tongue. Terri also sustained stab wounds to the left and right sides of

2

her neck and a stab wound to her left abdomen. According to the doctor, the wound to the right side of Terri's neck penetrated the jugular vein.

By his first issue, appellant contends the evidence is factually insufficient to support a negative finding on the punishment "affirmative defense" of sudden passion.[1] When, as here, we are called on to review the factual sufficiency of evidence supporting the jury's rejection of the defendant's position on an issue on which he bore the burden of proof by a preponderance of the evidence, we consider all the evidence relevant to the issue and determine whether the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 154-55 (Tex.Crim.App. 1990); *see Moranza v. State*, 913 S.W.2d 718, 724 (Tex.App.–Waco 1995, pet. ref'd) (applying standard to rejection of insanity defense). In reviewing a sudden passion issue, we consider the evidence adduced at both the guilt/innocence and punishment phases. *Trevino v. State*, 100 S.W.3d 232, 237 (Tex.Crim.App. 2003) (per curiam). There is no requirement that evidence admitted during guilt/innocence be re-offered during punishment to be considered. *Id*.

During the punishment phase of a murder trial, the defendant may argue that he caused the death while under the immediate influence of sudden passion arising from an

---

[1] Effective September 1, 1994, the Legislature amended the murder statute to provide for sudden passion to be raised by a defendant during punishment. *See* Act of May 27, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3613. Although appellant identifies sudden passion as an "affirmative defense," under the statute it is a mitigating circumstance and not a true affirmative defense. Tex. Pen. Code. Ann. § 19.02(d); *cf.* Tex. Pen. Code Ann. § 2.04(a) (Vernon 2003). Appellant is correct, however, that the statute places on him the burden to "prove the issue in the affirmative by a preponderance of the evidence . . . ." Tex. Pen. Code Ann. § 19.02(d).

adequate cause. Tex. Pen. Code Ann. § 19.02(d) (Vernon 2003); *Trevino*, 100 S.W.3d at 238. Sudden passion is a mitigating circumstance that, if proven by a preponderance of the evidence, reduces the offense from a first degree felony to a second degree felony. Tex. Pen. Code Ann. § 19.02(d) (Vernon 2003); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex.Crim.App. 2005).[2] "Sudden passion" is passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation. Tex. Pen. Code Ann. § 19.02(a)(2) (Vernon 2003). "Adequate cause" is cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. *Id.* at (a)(1).

Testimony indicated appellant came from a structured home environment with a supportive family. He was a good student in high school and participated in extracurricular activities. He dated one girl during the latter part of high school and was otherwise inexperienced with women. Appellant graduated early from high school, earned scholarships, and enrolled in a junior college. One month into college, he joined the military and decided to make it his career.

In 2000, appellant was stationed at Fort Hood. He met Terri the following year and after an uneventful first date, she called him a few days later. He visited her at her apartment and spent the night, but they were not intimate. Appellant was then deployed for a brief period and on his return, he and Terri began seeing each other regularly.

---

[2] We note that the Court of Criminal Appeals' opinion in *McKinney* was issued after appellant's brief was filed. 179 S.W.3d at 565.

Terri had two young sons by two different men and was unemployed. According to the testimony of Dr. Timothy Branaman, a forensic psychologist, Terri had a volatile personality and struggled with abandonment issues concerning men.[3] Terri's younger brother, who lived with her when she and appellant met, testified that Terri's financial resources consisted of State assistance and help from her grandparents. Appellant testified that Terri and her family asked him for financial assistance even though he still resided in the barracks.

Eventually, appellant and Terri's relationship became sexual, and sometime in late spring she told him she was pregnant. About that same time, appellant discovered he had contracted a sexually transmitted disease which he attributed to Terri because he had never been intimate with anyone else. Terri, however, blamed him for the disease. Appellant asked Terri to marry him because he did not want to have a baby out of wedlock or be labeled a "runaway guy." He testified Terri did not want to get married.

According to appellant, he notified his parents of the pregnancy and moved some of his belongings into Terri's apartment. He began providing financial support to Terri and her family, and began to look forward to his impending fatherhood. He made an effort to accept Terri and develop a closer relationship. Not long after announcing she was pregnant, Terri told appellant she had miscarried while he was at work.

---

[3] Branaman never met Terri, and his testimony was based on information from reports and records.

During the summer months appellant spent most of his leisure time at Terri's apartment even though he still had a room at the barracks. Terri began initiating arguments over insignificant matters and when appellant would attempt to leave, she would cry and plead with him not to do so. He said at times she would lock the door and stand in front of it to prevent his departure. He testified he did not physically move her from blocking the door because he believed any type of physical altercation between a soldier and a female would cause problems that would hinder his military career.

During this time, Terri began causing problems for appellant at work by placing frequent phone calls to him, sometimes calling every five minutes. The disruptions reflected poorly on his job performance reports prepared by his supervising sergeant. In an effort to remedy the situation, they invested in a cell phone. Nevertheless, Terri continued calling appellant at work to accuse him of being with another woman during working hours.

On August 20, while Terri's sons were not in the apartment, she started an argument with appellant. Both were without working vehicles at that time and Terri blamed him for their lack of transportation. Appellant decided to pack his belongings in his duffle bag and walk the long distance to Fort Hood. As he was walking down the street, he heard Terri screaming that her apartment was on fire. Both returned to the apartment, where the fire department was already on the scene extinguishing the fire. Terri suffered smoke inhalation. Most of her property was destroyed and the apartment was uninhabitable.

Appellant and Terri decided to stay together after the fire, and both thought it was the right time to marry and build a family with Terri's two sons. Appellant testified he was hopeful that he and Terri could build a marriage similar to that of his parents. With the expense of leasing a new apartment, appellant was unable to afford a marriage license until his next pay period. He chose not to notify his parents of his impending marriage because he did not want to burden them with his finances. He and Terri were married by a justice of the peace on either August 31 or September 1.

According to appellant, after the ceremony, he and Terri went out to eat and spent the day together. When they returned to their apartment, Terri "flipped out" and announced she was going out to a night club. She borrowed a car and left appellant home. She telephoned him several times that night to argue and scream at him, and he eventually hung up on her. She drove back to the apartment but remained in the car honking the horn and causing a scene. Appellant testified that he considered his predicament and, feeling ashamed and foolish, attempted suicide on his wedding night. He locked the apartment door, turned on the gas stove, and stuck his head inside the oven. Terri knocked on the front door and when he did not answer, she broke a window and entered. Appellant was rescued by the fire department and taken to a military hospital.

After his attempted suicide, appellant was counseled by one of his sergeants not to abandon Terri. At the suggestion of two other sergeants, he consulted a military attorney about a divorce. The Army attorney recommended a civilian attorney to appellant, but he did not then pursue a divorce.

7

After appellant was discharged from the hospital, he returned to work on September 11, 2001. He testified that the terrorist attacks that occurred on that date increased his stress level due to the frequency of alerts and preparedness exercises. Appellant was also stressed because Terri began making frequent phone calls to him at work again.

In mid-October shortly before Terri's death, appellant, Terri, and her sons drove to Dallas to spend time with his family. According to Mrs. Waites, Terri began treating her rudely after appellant and Terri married because she had expressed her reservations to Terri about the marriage. Mrs. Waites had chosen not to confront appellant on the subject because she did not want to cause any problems for Terri and appellant. When they arrived at appellant's parents' home, Terri refused to enter. Instead, she remained outside cursing, screaming and uttering threats which resulted in a call to the police. Mrs. Waites explained to the officers that Terri was welcome in her home if she could behave respectfully. After the officers calmed Terri down, she, her sons, and appellant left Dallas escorted by police to the county line. They stayed at appellant's brother's home near Dallas.

Terri telephoned a friend in Killeen to drive her and the boys home. Appellant stayed behind, and he and his mother visited his sick aunt in Dallas. Appellant sought his mother's help in getting a divorce, and she called a relative who prepared some divorce papers with a software program.

Divorce papers in hand, appellant drove back to Killeen on October 20 intent on moving back into the barracks. Upon arriving, he discovered his wallet containing his

8

military identification was missing. He testified he could not enter the base without his identification because of heightened security. After searching his car to no avail, he called his mother and brother to check if he had left the wallet in Dallas. They could not find it. Appellant asked his mother to come to Killeen.

Appellant returned to the apartment, and Terri arrived later. He informed her he had divorce papers and she began crying and locked herself in the bathroom. Just as appellant stepped outside to sit in his car, his mother and uncle arrived, and Terri left. While appellant's uncle was offering to help him move, his mother found his wallet in the trunk of his car. After appellant's mother and uncle left for Dallas, Terri returned home. She wanted to reconcile, but appellant told her his mind was made up and he would be leaving in the morning.

The next morning he unplugged the computer and began loading his possessions into his car. Terri opposed appellant removing any property and called the police to settle the dispute. Appellant was informed he could not remove any property that might be community property, but could remove clothes and personal hygiene items. Appellant packed his clothes and some personal items and drove to the base.

When appellant arrived at the base, he was notified that Terri had been calling him. They spoke on the phone, and she declared her love for him and pleaded with him to come home. He responded that if he returned, it would be to pack the rest of his things. Appellant then discovered that his room at the barracks had been assigned to another, so he loaded his clothes back into his car and drove to the apartment. He testified that he

9

parked his car at a nearby fast food restaurant and walked to the apartment because "Terri was acting crazy again and I didn't know what [she'd] do." He did not know where he would be staying that night after discovering he no longer had a room at the barracks.

Appellant testified that shortly after he entered the apartment, a police officer knocked on the door. Terri had again summoned officers and made accusations that appellant was trying to remove the computer, which he conceded was true because he had discovered a photo of a naked man on it. The officer informed appellant that because he and Terri were married, he could not prevent her from using the computer. Appellant decided to remain in the apartment, in part to protect his possessions. He and Terri sat on the couch and watched television. Terri cooked them something to eat, and then appellant overheard her speaking to someone on the phone in an excited state. According to appellant, Terri was happy when she hung up, and announced she and her sons were moving to Mississippi with someone named Joe. Appellant responded for her to "go ahead and leave, that would be the best thing that had ever happened to me." As he grabbed his keys and prepared to leave, Terri positioned herself in front of the door to prevent his departure. Appellant's testimony indicates that Terri's physical effort to keep him from leaving the apartment led to a further struggle between them. He testified he "tried to tell her to stop. She's beating at me and the next thing I know . . . I have her in a choke hold. I'm choking her. I'm mad at her. It's not as much as mad about - - I'm mad about the fight more than whatever else was going on between us because now, you know, she's - - she's trying to whoop me now."

When appellant was taken to jail, he gave a written statement summarizing the events that led to his choking Terri. The next day he gave a second, more detailed statement regarding the circumstances of her death. In his second written statement, appellant confessed that when he reached around Terri for the knob to their apartment door, attempting to leave, she "pushed him." The written statement continued:

> [t]hat's the point when I grabbed her around the neck and she started to swing her arms around, trying to get me off. She went down to the ground kicking. She was looking at me and I was telling her, I don't like what you're doing, I want all this to work, we can't have all these problems, you're pushing me to [sic] far. I remember her saying ok, ok. It was hard for her to breathe and I told her that I was trying to make her understand, I was only trying to scare her but I went to [sic] far. She got all blue and purple, her neck looked real bad. I let go and stood up and looked at her. She couldn't breathe, it was just short breaths. I started thinking, what have I done, I needed to call somebody to get help, I needed to call 911. I started to pray and she was still alive then. I was praying and praying and asking for forgiveness. . . . I started to think that I couldn't call the police because they would take me to jail, and that would mess up my career and I would go to prison. So I thought I had to get rid of her, I can't let her stop me from going on with my life, I have to overcome this situation. So I got the idea that if she's still breathing and I choked her as much as I could, I could fill the bathtub with water and throw her in, she would drown. So I turned on the water in the bathtub and I started dragging her body to the bathtub. She was still alive at this point, her breathing was getting worse, like louder like she was gasping. I thought somebody's gonna here [sic], I didn't want to get caught so I turned the radio on. I drug her to the bathtub, I had a hard time but I got her inside the tub. I filled the bathtub with water enough that it was about halfway full. I leaned her body over the tub and her face was in the water. Her face was facing down and she didn't have the strength to move. I left her there hoping she would die so I could get done with her and get over it. I pulled her head up to see if she had died yet but she was still breathing and I was afraid, I knew that I choked her and put her head in the water and that she was still alive. I knew I had made a mistake, that it wasn't supposed to be like this, I started to pray again asking for forgiveness and I started to think again that I can't let her to [sic] determine my life, that I had to get rid of her so I went to the kitchen and I grabbed a blade, a box cutter to slice her throat. I went back to the bathroom and made one attempt of slicing her neck but it was not easy to do so I tried again and I saw blood, a lot of blood and I panicked. I thought that I had to get out of the apartment,

11

I thought I could leave her there and say that I hadn't seen her all day, that someone else did it, then I thought again I had to get rid of her because somebody would find out it was me. So I went to the living room and put on my pants and shoes, my white pants, the first pants I had on were the brown pants. I walked to the Jack-In-The-Box to get my car and drove it back to the house. I went in the bathroom and checked on her. She was bleeding blood, there was a lot of blood but it bothered me to see her lying there in the blood so I went back into the living room to take my mind off of it. I sat there and watched TV, she's dead at this time. That didn't take my mind off of it. I opened my bible and read some pages and I started to pray again, begging for forgiveness. Then I went and checked on her, she wasn't bleeding fast enough so I ran and grabbed a second knife, the serrated knife on the dresser in the bedroom by the TV. I tried to stab her in the stomach, maybe she would bleed faster and I came [sic] with the idea that I needed to cut her body parts off so that she would be easier to carry but I couldn't bring myself to do it. I tried stabbing her in the stomach but there was no hole or marks or anything. I tried to again and this time there was a hole but no blood yet. I started getting more nervous, shaking, thinking I have to fix this problem and maybe I would be able to go on with my life once I got rid of her. So I went to the closet and got blankets and laid them on the floor in the front of the bed. I went to drag Terri from the bathtub to those blankets. Blood was getting all over the bathroom, and me and I wrapped her up in those blankets in the bedroom. Then it dawned on me that here was blood on my hands and blood all over the apartment, the bathroom and bedroom at that time so I knew I had to clean up. I started cleaning the bathroom with bleach and alcohol. I went to the kitchen and grabbed some trash bags and latex gloves. I started to clean everywhere with bleach and paper towels or regular towels where I thought I had touched with my hands. Then I put a plastic bag over her feet and taped the trash bag together to her body. I placed one over her head as far as it would go and I taped it to her body.

After further descriptions of his unsuccessful efforts to dispose of Terri's body, appellant's statement provided:

. . . [A]t that point I called my mother in Dallas and I told here that I had done something real bad. She asked what and I told her she wouldn't want to hear it. I asked to talk to my dad and I told him that I had killed Terri. He asked if I called anybody because she may still be alive and I said no, she's not alive.

12

Appellant continued in his statement that after speaking with his parents, he called his sergeant and then 9-1-1. He told the dispatcher he had killed his wife. He concluded in his statement that he was wrong to kill Terri and believed he should receive the death penalty.

During the punishment phase at trial, appellant's family members testified to his good character and offered to help him if he was granted community supervision. A Christian counselor testified that she met with appellant while he was in jail and he expressed remorse.

Dr. Branaman, the forensic psychologist, testified during punishment that he interviewed and tested appellant. He said appellant was depressed and very critical of himself. He had no history of violent behavior, substance abuse, or mental illness. In his opinion, appellant's family and the military provided structure which was important to appellant. By entering into a relationship with Terri and her sons, appellant was searching for additional structure. Branaman's evaluation of appellant suggested his family members were "extremely important" and he felt threatened when separated from those relationships.

The doctor's findings regarding Terri were that she "manifested unstable personality features, volatility, reactivity, indications of manipulative behavior, potentially self-destructive," and she did not trust relationships. He opined that the dynamics of the relationship between Terri and appellant were "pathological in nature."

The doctor described appellant's conduct as an "extraordinary response growing out of the circumstances . . . ." He said that after killing Terri, appellant panicked, which caused his anxiety level to rise and impair his judgment, which was evidenced by the "multiple, unorganized attempts that he made to cope with the situation . . . ." Regarding future dangerousness, the doctor testified there is a "low likelihood of committing any violent acts in the future."

Appellant argues the evidence that he wanted a divorce, that Terri attempted to make him jealous, and that she attacked him when he tried to leave the apartment on October 21 is sufficient to establish he was acting under the influence of sudden passion arising from an adequate cause when he killed her. We cannot agree that the jury's rejection of appellant's contention was so against the great weight and preponderance of the evidence as to be manifestly unjust. The jury could well have concluded from appellant's own testimony that he long had regretted his decision to become involved with Terri. He had been considering divorce for some time, and had told her of the existence of the divorce papers on the day before the murder. Although her attempt to prevent him from leaving their apartment led to tragic events on this occasion, it was not a new occurrence in their relationship. By appellant's testimony, she had behaved in a similar fashion before. The State points out the similarities in the facts of this case and those in *Richardson v. State*, 83 S.W.3d 351 (Tex.App.–Corpus Christi 2002, pet. ref'd), in which the defendant also argued the evidence supporting the jury's rejection of his sudden passion contention was factually insufficient. After recounting the evidence concerning the couple's relationship, the court in *Richardson* found, "[t]he jury could easily have

14

determined from the evidence that [the defendant] was resentful about his wife as a result of numerous things . . . , and that any passion arising as a result of any or all of these things was not sudden, but had been building up over time." *Id*. at 350. The same could be said here. The jury could have concluded that appellant acted not out of the immediate influence of sudden passion arising at the time of the offense but out of emotions that built up over time.

The jury also could have been influenced by the length of time involved in appellant's fatal assault on his wife and the multiple means by which he attacked her. As noted, evidence established that when emergency personnel arrived at the scene, Terri's body already was experiencing rigor mortis. Appellant's written statement indicates that, in his repeated attempts to insure Terri was dead, he first strangled her, then drowned her, cut her throat, and inflicted stab wounds. In *Richardson*, a forensic psychologist testified that "in view of the fact that there was a knock down, a strangling, and then a stabbing, that the murder took place over a period of time." 83 S.W.3d at 340. The doctor concluded the murder was not the result of sudden passion because it was not a single impulsive act in the heat of passion. *Id*. Here, by appellant's statement, while his wife still was breathing he rationally considered the consequences of his actions on his career before resuming his brutal activities.

Appellant's testimony also provided the jury with ample reason to disbelieve he killed his wife because of his reaction to her announcement she was moving to Mississippi with another man. Appellant responded to that statement by telling Terri her leaving "would be the best thing that ever happened to [him]." Further, given the evidence of his relationship

15

with Terri, the jury could have concluded that none of the causes appellant relies on for his sudden passion contention would, in a person of ordinary temper, commonly produce a degree of anger, rage or resentment sufficient to render his mind incapable of cool reflection. In sum, having reviewed the voluminous record from appellant's trial, we are led to the conclusion the jury's failure to find appellant acted under the immediate influence of sudden passion was supported by factually sufficient evidence. *Meraz*, 785 S.W.2d at 154-55; *see McKinney*, 179 S.W.3d at 569. Issue one is overruled.

Appellant maintains by his second issue that the punishment charge was fundamentally defective because the trial court erred in failing to instruct the jury on the law as contained in article 38.36 of the Texas Code of Criminal Procedure. Appellant concedes he failed to object to the omission, but argues the alleged error caused him egregious harm, under the analysis prescribed in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985). We overrule the issue.

Article 38.36(a) provides:

[i]n all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Article 38.36(a) is essentially a rule of evidence. *See Johnson v. State*, 140 Tex.Crim. 145, 149, 143 S.W.2d 771, 773-74 (1940) (on reh'g) (interpreting a predecessor statute to article 38.36(a)). In *Huizar v. State*, 720 S.W.2d 651, 654 (Tex.App.–San Antonio 1986,

pet. ref'd), the court noted that it was not mandatory to give an instruction based on a predecessor statute to article 38.36 nor reversible error to refuse to do so even though evidence contemplated by the statute had been introduced. *See Roberson v. State*, 144 S.W.3d 34, 42 (Tex.App.–Fort Worth 2004, pet. ref'd); *Richardson v. State*, 906 S.W.2d 646, 649 (Tex.App.–Fort Worth 1995, pet. ref'd).

Facts surrounding Terri's death and evidence of appellant's previous relationship with her, as well as his state of mind, were presented. The court's charge on guilt/innocence included language substantially tracking the language of article 38.36(a). The charge on punishment instructed the jury that "in deliberating on the punishment to be assessed, you may take into consideration all of the evidence admitted before you in the full trial of the case and the law submitted to you by the court." The trial court did not err by failing to include an instruction tracking article 38.36(a) in the punishment charge. *See Jones v. State*, 689 S.W.2d 510, 512 (Tex.App.–El Paso 1985, pet. ref'd), *opinion vacated*, 720 S.W.2d 535 (Tex.Crim.App. 1986). Because we conclude no error occurred, we need not address appellant's argument that the punishment charge was fundamentally defective and caused him egregious harm.

Having overruled appellant's issues, we affirm the trial court's judgment.


James T. Campbell
Justice


Do not publish.

17