NO. 07-09-0117-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

APRIL 30, 2009

______________________________


IN RE GREGORY DEAN BANISTER, RELATOR

_______________________________

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Relator, Gregory Dean Banister, proceeding pro se and in forma pauperis, seeks
a writ of mandamus to compel the Honorable Felix Klein, Judge of the 154th District Court
of Lamb County, to rule on various motions and requests which relate to the resolution of
a writ of habeas corpus.


 We deny Relatorâs petition for writ of mandamus.
Â Â Â Â Â Â Â Â Â Â According to Relatorâs petition and documents, on September 23, 2008, he filed a
writ of habeas corpus in the trial court pursuant to article 11.07 of the Texas Code of
Criminal Procedure relating to his September 16, 2004 conviction for aggravated assault.
Â 
Mandamus Standard of Review
Â Â Â Â Â Â Â Â Â Â âMandamus issues only to correct a clear abuse of discretion or the violation of a
duty imposed by law when there is no other adequate remedy by law.â Walker v. Packer,
827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding), quoting Johnson v. Fourth Court of
Appeals, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding).Â 
Â Â Â Â Â Â Â Â Â Â When a petition for writ of mandamus is filed, the relator has the burden to show
entitlement to the relief sought. Johnson, 700 S.W.2d at 917. A relator must satisfy three
requirements to show entitlement to the writ: (1) a legal duty to perform; (2) a demand for
performance; and (3) a refusal to act. Stoner v. Massey, 586 S.W.2d 843, 846 (Tex.
1979). A court is not required to consider a motion not called to its attention. Metzger v.
Sebek, 892 S.W.2d 20, 49 (Tex.App.âHouston [1st Dist.] 1994, writ denied). Showing that
a motion was filed with the clerk does not constitute proof that the motion was presented
or brought to the trial courtâs attention with a request for a ruling. In re Chavez, 62 S.W.3d
225, 228 (Tex.App.âAmarillo 2001, orig. proceeding).
Â Â Â Â Â Â Â Â Â Â When a motion is properly pending before a trial court, the act of considering and
ruling upon it is a ministerial act. Eli Lilly and Co. v. Marshall, 829 S.W.2d 157, 158 (Tex.
1992). However, the trial court has a reasonable time within which to perform that
ministerial duty. Safety-Kleen Corp. v. Garcia, 945 S.W.2d 268, 269 (Tex.App.âSan
Antonio 1997, orig. proceeding). Whether a reasonable period of time has lapsed is
dependent on the circumstances of each case. Barnes v. State, 832 S.W.2d 424, 426
(Tex.App.âHouston [1st Dist.] 1992, orig. proceeding).
Article 11.07 - Habeas Corpus
Â Â Â Â Â Â Â Â Â Â A post-conviction application for writ of habeas corpus in a felony case, other than
a case in which the death penalty is imposed, must be filed with the clerk of the court in
which the conviction being challenged was obtained. Tex. Code Crim. Proc. Ann. art.
11.07, Â§ 3(b) (Vernon Supp. 2008).


 Upon receipt of the application, the clerk is required
to forward a copy thereof to the attorney representing the state. Id. The attorney
representing the state has 15 days after the date the copy of the application is received to
file an answer. Id.; See Gibson v. Dallas County Dist. Clerk, 275 S.W.3d 491 (Tex.Crim.
App. 2009) (impliedly holding the date on which the clerk receives the application as the
date on which the 15-day answer period begins); But see Op. Tex. Atty. Gen., No. JM-608
(1986) (finding the date on which the stateâs attorney receives the application is the date
on which the 15-day answer period begins). Within 20 days of the expiration of the time
in which the state is allowed to answer, the convicting court shall decide whether there are
controverted, previously unresolved facts material to the legality of the applicantâs
confinement. Article 11.07, Â§ 3(c). If the convicting court finds that there are no such
issues, or if it fails to act within the 20 days allowed, the clerk of the convicting court shall
immediately transmit a copy of the application to the Court of Criminal Appeals. Id. If the
convicting court finds that there are such issues, within that same period of time, it must
enter an order designating the issues of fact to be resolved. Article 11.07, Â§ 3(d). The
convicting court, within the exercise of its sound discretion, must then act to resolve the
controverted, previously unresolved fact issues, and issue findings of fact. Id. The
convicting court is not, however, required to hold a hearing before entering findings of fact. 
Ex parte Davila, 530 S.W.2d 543, 545 (Tex.Crim.App. 1975). Furthermore, the trial judge
has no ministerial duty under article 11.07 to enter findings within a specified period of
time. Rodriguez v. 208th Judicial Dist. Court, No. WR 66224-01, 2007 WL 171975, at *1
(Tex.Crim.App. Jan. 24, 2007) (not designated for publication). That decision lies within
the trial judgeâs sound discretion. Id. Upon issuance of the findings of fact, the clerk of the
convicting court shall immediately transmit to the Court of Criminal Appeals, the
application, any answers filed, any motions filed, transcripts of any depositions or hearings,
any affidavits, and any other matters such as official records used by the convicting court
in resolving issues of fact. Article 11.07, Â§ 3(d).
Analysis
Â Â Â Â Â Â Â Â Â Â Relator alleges he has numerous motions and requests pending in the trial court
that relate to his application for an article 11.07 writ of habeas corpus. The documents
contained in his appendices reflect file stamp dates from September 23, 2008 through
November 19, 2008. However, nothing in the limited record before us demonstrates
whether the convicting court ever entered an order designating the issues of fact to be
resolved. 
Â Â Â Â Â Â Â Â Â Â If the convicting court did not timely enter an order designating issues of fact to be
resolved, the clerk of that court was required to immediately transmit Relatorâs application
to the Court of Criminal Appeals. In such case, the convicting court had no duty to perform
the acts which Relator seeks to compel. In the absence of a duty to perform, Relator is not
entitled to the relief sought. 
Â Â Â Â Â Â Â Â Â Â Furthermore, even assuming an order designating issues was timely filed, nothing
demonstrates that Relator presented his motions and requests to the trial court and that
it refused to act. Furthermore, Relator has not provided any authority that the delay, if any,
in ruling on his motions is an unreasonable time period as a matter of law. Accordingly,
we conclude that Relator has not satisfied his burden to provide a sufficient record
demonstrating that properly filed motions have awaited disposition for an unreasonable
length of time nor that the trial court has refused to perform a ministerial duty. Neither has
Relator demonstrated that the trial court has abused its discretion or violated a duty
imposed by law. 
Â Â Â Â Â Â Â Â Â Â Consequently, Relatorâs petition for writ of mandamus is denied.
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Patrick A. Pirtle

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 




w." 

 When appellant was taken to jail, he gave a written statement summarizing the
events that led to his choking Terri. The next day he gave a second, more detailed
statement regarding the circumstances of her death. In his second written statement,
appellant confessed that when he reached around Terri for the knob to their apartment
door, attempting to leave, she "pushed him." The written statement continued: 

 [t]hat's the point when I grabbed her around the neck and she started to
swing her arms around, trying to get me off. She went down to the ground
kicking. She was looking at me and I was telling her, I don't like what you're
doing, I want all this to work, we can't have all these problems, you're
pushing me to [sic] far. I remember her saying ok, ok. It was hard for her to
breathe and I told her that I was trying to make her understand, I was only
trying to scare her but I went to [sic] far. She got all blue and purple, her
neck looked real bad. I let go and stood up and looked at her. She couldn't
breathe, it was just short breaths. I started thinking, what have I done, I
needed to call somebody to get help, I needed to call 911. I started to pray
and she was still alive then. I was praying and praying and asking for
forgiveness. . . . I started to think that I couldn't call the police because they
would take me to jail, and that would mess up my career and I would go to
prison. So I thought I had to get rid of her, I can't let her stop me from going
on with my life, I have to overcome this situation. So I got the idea that if
she's still breathing and I choked her as much as I could, I could fill the
bathtub with water and throw her in, she would drown. So I turned on the
water in the bathtub and I started dragging her body to the bathtub. She was
still alive at this point, her breathing was getting worse, like louder like she
was gasping. I thought somebody's gonna here [sic], I didn't want to get
caught so I turned the radio on. I drug her to the bathtub, I had a hard time
but I got her inside the tub. I filled the bathtub with water enough that it was
about halfway full. I leaned her body over the tub and her face was in the
water. Her face was facing down and she didn't have the strength to move. 
I left her there hoping she would die so I could get done with her and get
over it. I pulled her head up to see if she had died yet but she was still
breathing and I was afraid, I knew that I choked her and put her head in the
water and that she was still alive. I knew I had made a mistake, that it wasn't
supposed to be like this, I started to pray again asking for forgiveness and
I started to think again that I can't let her to [sic] determine my life, that I had
to get rid of her so I went to the kitchen and I grabbed a blade, a box cutter
to slice her throat. I went back to the bathroom and made one attempt of
slicing her neck but it was not easy to do so I tried again and I saw blood, a
lot of blood and I panicked. I thought that I had to get out of the apartment,
I thought I could leave her there and say that I hadn't seen her all day, that
someone else did it, then I thought again I had to get rid of her because
somebody would find out it was me. So I went to the living room and put on
my pants and shoes, my white pants, the first pants I had on were the brown
pants. I walked to the Jack-In-The-Box to get my car and drove it back to the
house. I went in the bathroom and checked on her. She was bleeding
blood, there was a lot of blood but it bothered me to see her lying there in the
blood so I went back into the living room to take my mind off of it. I sat there
and watched TV, she's dead at this time. That didn't take my mind off of it. 
I opened my bible and read some pages and I started to pray again, begging
for forgiveness. Then I went and checked on her, she wasn't bleeding fast
enough so I ran and grabbed a second knife, the serrated knife on the
dresser in the bedroom by the TV. I tried to stab her in the stomach, maybe
she would bleed faster and I came [sic] with the idea that I needed to cut her
body parts off so that she would be easier to carry but I couldn't bring myself
to do it. I tried stabbing her in the stomach but there was no hole or marks
or anything. I tried to again and this time there was a hole but no blood yet. 
I started getting more nervous, shaking, thinking I have to fix this problem
and maybe I would be able to go on with my life once I got rid of her. So I
went to the closet and got blankets and laid them on the floor in the front of
the bed. I went to drag Terri from the bathtub to those blankets. Blood was
getting all over the bathroom, and me and I wrapped her up in those blankets
in the bedroom. Then it dawned on me that here was blood on my hands
and blood all over the apartment, the bathroom and bedroom at that time so
I knew I had to clean up. I started cleaning the bathroom with bleach and
alcohol. I went to the kitchen and grabbed some trash bags and latex
gloves. I started to clean everywhere with bleach and paper towels or
regular towels where I thought I had touched with my hands. Then I put a
plastic bag over her feet and taped the trash bag together to her body. I
placed one over her head as far as it would go and I taped it to her body. 


After further descriptions of his unsuccessful efforts to dispose of Terri's body, appellant's
statement provided:

 . . . [A]t that point I called my mother in Dallas and I told here that I had done
something real bad. She asked what and I told her she wouldn't want to
hear it. I asked to talk to my dad and I told him that I had killed Terri. He
asked if I called anybody because she may still be alive and I said no, she's
not alive.


Appellant continued in his statement that after speaking with his parents, he called his
sergeant and then 9-1-1. He told the dispatcher he had killed his wife. He concluded in
his statement that he was wrong to kill Terri and believed he should receive the death
penalty.

 During the punishment phase at trial, appellant's family members testified to his
good character and offered to help him if he was granted community supervision. A
Christian counselor testified that she met with appellant while he was in jail and he
expressed remorse. 

 Dr. Branaman, the forensic psychologist, testified during punishment that he
interviewed and tested appellant. He said appellant was depressed and very critical of
himself. He had no history of violent behavior, substance abuse, or mental illness. In his
opinion, appellant's family and the military provided structure which was important to
appellant. By entering into a relationship with Terri and her sons, appellant was searching
for additional structure. Branaman's evaluation of appellant suggested his family members
were "extremely important" and he felt threatened when separated from those
relationships.

 The doctor's findings regarding Terri were that she "manifested unstable personality
features, volatility, reactivity, indications of manipulative behavior, potentially self-destructive," and she did not trust relationships. He opined that the dynamics of the
relationship between Terri and appellant were "pathological in nature."

 The doctor described appellant's conduct as an "extraordinary response growing out
of the circumstances . . . ." He said that after killing Terri, appellant panicked, which
caused his anxiety level to rise and impair his judgment, which was evidenced by the
"multiple, unorganized attempts that he made to cope with the situation . . . ." Regarding
future dangerousness, the doctor testified there is a "low likelihood of committing any
violent acts in the future."

 Appellant argues the evidence that he wanted a divorce, that Terri attempted to
make him jealous, and that she attacked him when he tried to leave the apartment on
October 21 is sufficient to establish he was acting under the influence of sudden passion
arising from an adequate cause when he killed her. We cannot agree that the jury's
rejection of appellant's contention was so against the great weight and preponderance of
the evidence as to be manifestly unjust. The jury could well have concluded from
appellant's own testimony that he long had regretted his decision to become involved with
Terri. He had been considering divorce for some time, and had told her of the existence
of the divorce papers on the day before the murder. Although her attempt to prevent him
from leaving their apartment led to tragic events on this occasion, it was not a new
occurrence in their relationship. By appellant's testimony, she had behaved in a similar
fashion before. The State points out the similarities in the facts of this case and those in
Richardson v. State, 83 S.W.3d 351 (Tex.App.-Corpus Christi 2002, pet. ref'd), in which
the defendant also argued the evidence supporting the jury's rejection of his sudden
passion contention was factually insufficient. After recounting the evidence concerning the
couple's relationship, the court in Richardson found, "[t]he jury could easily have
determined from the evidence that [the defendant] was resentful about his wife as a result
of numerous things . . . , and that any passion arising as a result of any or all of these
things was not sudden, but had been building up over time." Id. at 350. The same could
be said here. The jury could have concluded that appellant acted not out of the immediate
influence of sudden passion arising at the time of the offense but out of emotions that built
up over time. 

 The jury also could have been influenced by the length of time involved in
appellant's fatal assault on his wife and the multiple means by which he attacked her. As
noted, evidence established that when emergency personnel arrived at the scene, Terri's
body already was experiencing rigor mortis. Appellant's written statement indicates that,
in his repeated attempts to insure Terri was dead, he first strangled her, then drowned her,
cut her throat, and inflicted stab wounds. In Richardson, a forensic psychologist testified
that "in view of the fact that there was a knock down, a strangling, and then a stabbing, that
the murder took place over a period of time." 83 S.W.3d at 340. The doctor concluded the
murder was not the result of sudden passion because it was not a single impulsive act in
the heat of passion. Id. Here, by appellant's statement, while his wife still was breathing
he rationally considered the consequences of his actions on his career before resuming 
his brutal activities. 

 Appellant's testimony also provided the jury with ample reason to disbelieve he killed
his wife because of his reaction to her announcement she was moving to Mississippi with
another man. Appellant responded to that statement by telling Terri her leaving "would be
the best thing that ever happened to [him]." Further, given the evidence of his relationship
with Terri, the jury could have concluded that none of the causes appellant relies on for his
sudden passion contention would, in a person of ordinary temper, commonly produce a
degree of anger, rage or resentment sufficient to render his mind incapable of cool
reflection. In sum, having reviewed the voluminous record from appellant's trial, we are led
to the conclusion the jury's failure to find appellant acted under the immediate influence
of sudden passion was supported by factually sufficient evidence. Meraz, 785 S.W.2d at
154-55; see McKinney, 179 S.W.3d at 569. Issue one is overruled.

 Appellant maintains by his second issue that the punishment charge was
fundamentally defective because the trial court erred in failing to instruct the jury on the law
as contained in article 38.36 of the Texas Code of Criminal Procedure. Appellant
concedes he failed to object to the omission, but argues the alleged error caused him
egregious harm, under the analysis prescribed in Almanza v. State, 686 S.W.2d 157, 171
(Tex.Crim.App. 1985). We overrule the issue.

 Article 38.36(a) provides:

 [i]n all prosecutions for murder, the state or the defendant shall be permitted
to offer testimony as to all relevant facts and circumstances surrounding the
killing and the previous relationship existing between the accused and the
deceased, together with all relevant facts and circumstances going to show
the condition of the mind of the accused at the time of the offense.

Article 38.36(a) is essentially a rule of evidence. See Johnson v. State, 140 Tex.Crim. 145,
149, 143 S.W.2d 771, 773-74 (1940) (on reh'g) (interpreting a predecessor statute to
article 38.36(a)). In Huizar v. State, 720 S.W.2d 651, 654 (Tex.App.-San Antonio 1986,
pet. ref'd), the court noted that it was not mandatory to give an instruction based on a
predecessor statute to article 38.36 nor reversible error to refuse to do so even though
evidence contemplated by the statute had been introduced. See Roberson v. State, 144
S.W.3d 34, 42 (Tex.App.-Fort Worth 2004, pet. ref'd); Richardson v. State, 906 S.W.2d
646, 649 (Tex.App.-Fort Worth 1995, pet. ref'd). 

 Facts surrounding Terri's death and evidence of appellant's previous relationship
with her, as well as his state of mind, were presented. The court's charge on
guilt/innocence included language substantially tracking the language of article 38.36(a). 
The charge on punishment instructed the jury that "in deliberating on the punishment to be
assessed, you may take into consideration all of the evidence admitted before you in the
full trial of the case and the law submitted to you by the court." The trial court did not err
by failing to include an instruction tracking article 38.36(a) in the punishment charge. 
SeeÂ Jones v. State, 689 S.W.2d 510, 512 (Tex.App.-El Paso 1985, pet. ref'd), opinion
vacated, 720 S.W.2d 535 (Tex.Crim.App. 1986). Because we conclude no error occurred,
we need not address appellant's argument that the punishment charge was fundamentally
defective and caused him egregious harm. 

 Having overruled appellant's issues, we affirm the trial court's judgment.



 James T. Campbell

 Justice



Do not publish.
1. Effective September 1, 1994, the Legislature amended the murder statute to
provide for sudden passion to be raised by a defendant during punishment. See Act of
May 27, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3613. 
Although appellant identifies sudden passion as an "affirmative defense," under the statute
it is a mitigating circumstance and not a true affirmative defense. Tex. Pen. Code. Ann.
Â§ 19.02(d); cf. Tex. Pen. Code Ann. Â§ 2.04(a) (Vernon 2003). Appellant is correct,
however, that the statute places on him the burden to "prove the issue in the affirmative
by a preponderance of the evidence . . . ." Tex. Pen. Code Ann. Â§ 19.02(d). 
2. We note that the Court of Criminal Appeals' opinion in McKinney was issued after
appellant's brief was filed. 179 S.W.3d at 565.
3. Branaman never met Terri, and his testimony was based on information from
reports and records.